CARSON STEEL, RONALD STEEL AND MRS. RONALD STEEL v.
STATE OF ARKANSAS

5-5386                                               436 S.W. 2d 800

Opinion Delivered February 10, 1969

*John B. Hainen* for appellants.

*Joe Purcell,* Atty. Gen. and *Don Langston,* Asst. Atty. Gen. for appellee.

Carleton Harris, Chief Justice.    This appeal concerns a bank robbery.    On the morning of September 27, 1967, a little after 10:00 o'clock, the Bank of Lockesburg, Lockesburg, Arkansas, was robbed by a lone gunman.    As he entered the bank, this man pulled a ladies' stocking over his face, directed bank employees and customers to lie down on the floor, and told R. C. Norwood, president of the bank, to open the safe.    Mrs. R. C. Norwood, also a bank employee, asked if she would be permitted, rather than her husband, to open the safe, and upon receiving a reply in the affirmative, opened it, and, together with the robber, took money, which he placed in a sack having the appearance of a large pillow case.    The amount taken was $12,814.00.    Thereupon, the gunman ran out of the bank, and drove off in a 1966 blue Ford sedan in a northerly direction.    Officers in the area were alerted, and road blocks and other measures were effected in an effort to secure the capture of the robber.    In less than an hour, Ronald Steel, his wife, Doris Steel, brother, Carson Steel, Jr., and Doyce McCary were arrested in connection with the holdup. All were subsequently charged with robbery[1], and on trial appellants were found guilty by a jury.    The two brothers were given 15 years imprisonment, and Doris Steel was given 5 years imprisonment.    From the judgment so entered, appellants bring this appeal.    Several points are urged for reversal, and we proceed to discuss these contentions, though not necessarily in the order listed.

---

[1]McCary is not involved in the present appeal, nor does the record reflect what disposition, if any, has been made of the case against him.

First, the sufficiency of the evidence to sustain the convictions is questioned. In chronological order, the facts developed were as follows:

Bobby Friday operated an Esso service station at Lockesburg, the station being located across the street from the bank. Mrs. Bessie Dowdle, who had apparently left her automobile at the station while she went to the bank, returned and told Friday that the bank was being robbed[2]. As she was telling Friday of the occurence, he heard the squeal of tires, looked up, and saw a 1965 or 1966 light blue Ford being driven away. Friday endeavored to get the license number, and testified that the car sped away heading north on Highway 71[3]. The witness only observed that someone was driving the car, and he saw no one else standing around the bank.

Louis Hilton, Sheriff of Sevier County, on September 26 received a report that a 1966 Ford with Sevier County tag No. 56-2321 had been stolen from the rubber plant in DeQueen. About 10:15 or 10:20 A.M. on the 27th he received the report of the bank robbery, and also information about the blue 1966 Ford. The sheriff started for Lockesburg in his automobile, and Carroll Page of the Arkansas State Police left at the same time as the sheriff in a separate automobile. While traveling Highway 71, between DeQueen and Lockesburg, Hilton observed a tan 1965 Pontiac automobile parked on a crossroad on the west side of 71, about 100 yards from the highway. The sheriff drove over to the car, stopped, and inquired of the occupant, a young woman, if she needed help. She said that she did not, and when asked what she was doing there, replied that she was waiting on her husband. The woman gave her name as Doris Steel, and stated that her husband had told her to wait there and he would be back in a few minutes;

---

[2]According to other witnesses, Mrs. Dowdle had started into the bank, saw what was going on, and backed out.

[3]He missed the year, and took the number as 56-2322, whereas the number actually was 56-2321.

she did not know where he had gone, but said he was in a pickup truck, and would be back shortly. According to the sheriff, Mrs. Steel was dressed in blue jean shorts, a blue jacket with the word, ''Alaska,'' written on it, and was barefooted.

Louis Graves, publisher and editor of the newspaper at Nashville, Arkansas, drove up to where the sheriff and Mrs. Steel were talking. It developed that Page also, while traveling on the highway, had observed the Pontiac parked on the side road, and the state officer had requested Graves (upon meeting the latter on the highway), to ''check it out'' for him. While talking, they heard a vehicle approaching. From the sheriff's testimony:

''* * * As I was talking to Mrs. Steel, there was a pickup truck started down this same road, and I heard the pickup truck's brakes, when he applied his brakes. There was some loose gravel on this part of the pavement. I heard that and I looked up and saw the pickup was headed in the direction of where we were at, and it immediately backed up and turned around and headed north.''

He said that he could tell that three people were in the pickup, and he immediately started in pursuit, asking Graves if he would remain there with Mrs. Steel until he returned. Describing events, the sheriff continued:

''Well, I was in pursuit. The car went on north on 71 until it came to a dead-end road, which goes up to Mr. Bradshaw's residence. The pickup turned up that road. * * *

''After I got on to 71, I saw the pickup, and then the pickup dropped out of sight for, oh, I'd say a few seconds. * * *

" * * * After I got to the point where I had seen the pickup last, I could see on this straight stretch for possibly a mile or a mile and a half, and it wasn't there. I knew about this road, and as I got to this road I felt it had turned up that way, and when I looked up the road, I saw the pickup on the Bradshaw road."

When the officer turned up the road, the pickup "took off real fast." The sheriff continued behind, blowing his horn, endeavoring to persuade the driver of the truck to stop, and then held his rifle out the window and fired into the air. The truck then stopped, approximately 150 yards from a private drive leading to the home of William Henry Bradshaw. The sheriff directed the occupants of the pickup to get out of the truck with their hands up, and further directed them to lie on the ground face down. About that time, Bradshaw, having heard the shot, came to the scene, and the sheriff had Bradshaw hold the gun while he (the sheriff) searched the three occupants of the truck. No comprehensive search of the vehicle was made at that time, though Hilton testified that he looked in the bed of the pickup, saw two pistols lying in a cardboard box, reached in and got the weapons, and found that they were loaded. He subsequently obtained a search warrant for the pickup, and also a search warrant for the Pontiac automobile occupied by Mrs. Steel. The three men in the pickup were appellants, Ronald and Carson Steel, Jr., and Doyce McCary. When the sheriff walked a short distance down the road, looking over the area in furtherance of his investigation, Bradshaw heard Ronald Steel say, "Now that they've got us, what are we going to do?" McCary told Steel to keep his mouth shut. The three were driven back to Lockesburg by Bradshaw in the pickup, with the sheriff following. Upon arriving there, they were taken to the bank. In the meantime, Graves had brought Mrs. Steel to the bank.

There, Mrs. Norwood, and some others who were

in the bank at the time of the robbery, were present. Mrs. Norwood testified that she was not asked to make an identification, and she did not volunteer an identification. No one identified the man who had held them at gunpoint when the robbery took place[4]. Statements were taken from the two Steel brothers about 11:15 A.M. after they had signed waivers and acknowledged that they had been advised of their constitutional rights. Both steadfastly maintained that they were not guilty of robbing the bank. Later on in the day, Ralph Rawlings, a special agent with the F.B.I., interviewed Ronald and Carson Steel at the County Jail in Nashville, and talked with Mrs. Steel at the sheriff's office in DeQueen. The officer testified that he explained to each appellant his or her rights, and further presented each with a written statement of rights, and a waiver form, which he also explained. The special agent tesified that all voluntarily signed the waiver. Rawlings said that all stated they could read, and, before signing, they were advised that they were being investigated for the robbery of the bank. None .of the appellants signed any statement as to his or her activities, and none asked for the services of a lawyer, but they did orally answer questions. Ronald Steel related that he and his wife, on September 26, were at his mother's home near Broken Bow, Oklahoma; that they went to the home of Doyce McCary at Wright City, Oklahoma, finding Carson Steel, McCary's wife, and another woman there. After staying a while, Ronald and his wife returned to Broken Bow, remaining at the mother's during the night; the next morning, Carson Steel and McCary came to the home in McCary's pickup truck. All four then left in two vehicles, Ronald and Doris being together in the Pontiac, and McCary and Carson Steel traveling in the Ford pickup. Ronald said that the reason for the trip was to go deer hunting. The officer called attention to the fact that it was not deer season, and that appellant did not have a rifle or shotgun, but Ronald replied that

[4]Carroll Page testified that he "probably" asked if the bank bandit could be identified by anyone present.

he was going to shoot deer with his pistol (a snub-nose). According to this appellant, the purpose in turning down the road (where the appellants were apprehended by the sheriff) was to ask a man about purchasing a dog.

Carson Steel related that he had spent the night of September 26 at the home of McCary and Mrs. McCary, but said (contrary to Ronald) that they had no visitors. He stated that he and McCary drove the next morning to Broken Bow, stopped at his mother's home, and there joined Ronald and Doris. According to this brother, he and Doyce left first in the pickup truck; the purpose in going to Lockesburg was to find some coon dogs. They met Ronald and his wife about 9:30 A.M., and the brother got into the truck with them, leaving the wife where they had parked the automobile. He was unable to name anyone that they contacted about dogs.

Doris Steel related that she and her husband had visited McCary and his wife on the night of the 26th and had returned to the mother's home at Broken Bow, where they spent the night. She said that Ronald had told her she could go deer hunting with them the next day, and she and her husband left home and were joined by McCary and Carson in Lockesburg. She told the officer that the men would not let her go deer hunting with them because she had forgotten her shoes.

As previously stated, search warrants were obtained, and both the pickup truck and Pontiac automobile were searched. The only items found in the pickup truck (outside of the two pistols) that could have any bearing on the robbery were a white homemade pillow case and a new handkerchief which was knotted. The only item found in the Pontiac that could be considered relevant to the crime was one ladies' stocking.

The 1966 blue Ford automobile with the license No. 56-2321 was found about six miles west of Lockesburg, 160 paces north of Highway 24, but appellants were

never connected with this automobile. A light blue 1963 Chevrolet automobile was found in the Tower Road vicinity the morning of the robbery, which bore a fictitious Oklahoma license[5]. This car was apparently found about six miles from Lockesburg, but appellants were never connected with this vehicle. About a mile and a half from where this car was found, the officers located a spot where the road had been washed out and traffic could not go farther. From impressions, it was obvious that two motor vehicles had been parked close together, one having road grip tires used on automobiles, and the other bearing a type usually used on pickups; the area had the appearance of several people having stood between these vehicles. Richard O'Connell of the F.B.I. picked up a paper tag which has been torn off a piece of material. The tag read, "100% Cotton RN 14240." The officer placed this in an envelope, and it was subsequently sent to the F.B.I. laboratory in Washington. Cigarette butts were found and also a bare heel print.

William S. Oberg, a document examiner employed at the F.B.I. laboratory in Washington, testified that he made an examination of the label found by Officer O'Connell, and the handkerchief found in the pickup truck. After explaining in detail how the examination was conducted, Oberg testified that the label had originally been attached to the handkerchief taken from the truck. A small part of the paper tag had remained on the handkerchief. From the testimony:

"The outline portion of State's Exhibit No. 3 [label] matches the torn outline of the paper on State's Exhibit No. 10 [handkerchief], and as a result, I concluded that State's Exhibit No. 3 was derived from State's Exhibit No. 10, that at one time

---

[5]One of the officers mentioned a Chevrolet automobile with a Texas license, but it is not clear whether he was speaking of the same Chevrolet.

they were part and parcel of the same thing'"[6].

On cross-examination, Oberg repeated his conclusions rather emphatically.

Lawrence Dinger, who lives a few miles from De-Queen, was formerly a resident of Bartlesville, Oklahoma. He testified that he saw Ronald Steel in November, 1967, at a tavern near Broken Bow, Oklahoma, and which was owned by an uncle of the Steel boys. Dinger said that Ronald Steel was talking to an acquaintance of Dinger named William Allen, and that, as he (Dinger) walked up to the two men, he heard Ronald Steel say to Allen, ''The money is buried and we haven't touched a dime of it.''

It is true that most of the evidence was circumstantial, but we think the circumstances, when taken together, constitute sufficient evidence to sustain the convictions. No evidence was offered on behalf of appellants of why they made the trip from Oklahoma to Lockesburg—what they did after arriving at Lockesburg—why the men fled from the sheriff, and would not stop the pickup—why Doris Steel was sitting alone in the Pontiac —or why only one stocking was in the car. Of course, the jury probably did not consider the explanation given to the officers as credible. Deer hunting—out of season—without dogs—and with pistols—could hardly be called a plausible or reasonable explanation of appellants' actions prior to their arrest. The testimony of William Henry Bradshaw stood uncontradicted, and though no positive identification was made, Mrs. Norwood, at the trial, pointed out Ronald Steel as the man, in her opinion, who robbed the bank, stating, ''Well, in my own mind I think so.''

It is contended that the constitutional rights of these appellants were violated, and several federal cases

---

[6]A new handkerchief was taken from both Ronald and Carson Steel, and the similarity of those handkerchiefs to Exhibit No. 10 prompted the officers to send in Exhibits 3 and 10.

are cited in support of this contention. It is asserted that a line-up occurred at the bank when appellants were taken there after the robbery. The United States Supreme Court has held several times that a suspect is entitled to counsel, unless waived, when he is confronted by witnesses for an out of court identification. *United States* v. *Wade,* 388 U. S. 218, *Stovall* v. *Denno,* 388 U.S. 293, *Gilbert* v. *California,* 388 U.S. 263. We find no violation of the rule set down in those cases. Mrs. Norwood stated that she was not asked to identify any of the appellants as the robber, and no out of court identification was made. Actually, the evidence of the confrontation was elicited by appellants during cross-examination of Mrs. Norwood as a matter of testing her credibility relative to her remarks made on the witness stand as to identification of Ronald Steel.

It is argued that the testimony of Bradshaw constituted error. We do not agree. The statement of Ronald Steel was a spontaneous and voluntary statement, and was made at a time when he was not being interrogated. We have held such statements admissible. *Turney* v. *State,* 239 Ark. 851, 395 S.W. 2d 1.

It is urged that the search of the pickup truck by the sheriff at the time of apprehending the appellants was illegal. We find no merit in this contention. The sheriff, of course, was entitled to search the truck, if the arrest were lawful. Under the circumstances, it clearly appears that the officer had reasonable grounds to believe that the appellants had committed a felony, and the search was therefore incident to a lawful arrest. The bank had just been robbed, and the occupants of the pickup truck were very clearly fleeing, and endeavoring to get away from the sheriff. Not only that, but, according to his testimony, the two pistols in the pickup were in clear view.

Appellants also question the validity of the search warrants, but no objection on this basis was made at

the time of the introduction into evidence of the property taken from the vehicles, nor was any motion made to suppress this evidence. In *Moore, Frazier, Davidson* v. *State*, 244 Ark. 1197, 429 S.W. 2d 122, we held that the burden of proving the invalidity of a search warrant rests on the defendant, and if it is contended that the warrant is not valid, the affidavit and warrant in support of a motion to suppress should be produced. Objection was made to the introduction of articles found in the vehicles as being immaterial and irrelevant, but we have already pointed out that some articles were relevant, and certainly there was no prejudice in the presentation of articles (mostly clothing) which failed to connect appellants with the crime.

It is asserted that the holding in *Gideon* v. *Wainwright*, 372 U.S. 335, was violated, but this assertion is erroneous, as an attorney was appointed by the court to represent these appellants. The argument itself is really directed to a contention that the appointed counsel did not furnish adequate representation. From the brief:

> "An additional problem on the appointment of counsel simply cannot be avoided. The appointment of counsel of experience is important. This Court has judicial knowledge of the experience of the Court appointed lawyer who had not been long in practice, never appealed a case."

The record does not reflect whether this attorney had appealed a criminal case, but appellate practice would hardly seem to be as important as experience in trial practice. This phase of his practice is not shown, but the experience or ability of appointed counsel is not so important in this case as it might be in others, since appellants were also represented by an Oklahoma attorney. When defendants are represented by counsel of their own choice, they are hardly in a position to complain that court appointed counsel was inadequate. Pres-

ent counsel intimates that the Oklahoma attorney was not qualified to represent these appellants because he was not a member of the Arkansas Bar. We very quickly disagree—but of course, an accused person is entitled to retain whomever he desires to represent him.

It is argued that the requirements of the rule established in *Miranda* v. *Arizona*, 384 U.S. 436, were not complied with. We find no merit in this allegation. While none of the appellants testified before the jury, all three testified before the court in chambers relative to the statements. Ronald said that he was not advised of constitutional rights, though he admitted reading the waivers. Carson said that he had already made some statement before signing the waiver. Doris said that she was nervous and couldn't comprehend the meaning of the waiver. The court held that the statements were voluntarily made after appellants were advised of their constitutional rights and this finding is supported by the weight of the evidence.

As heretofore pointed out, the state's proof reflected that each appellant was handed a waiver which set out the constitutional rights enumerated in *Miranda;* each read the instrument, and each voluntarily signed the waiver. No complaint is made about the federal waiver, other than it is not in harmony with the one given by the state, and counsel argues that appellants were given conflicting advice. We find no conflicts. The state waiver reads as follows:

"Before we ask you any question, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. You have the right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will*

*be appointed for you, if you wish, if and when you go to court*[7]. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop at any time until you talk with a lawyer.

## *WAIVER*

"I have read the statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me."

This waiver is practically identical with the one used by federal officers, except for the italicized sentence[8].

---

[7]Emphasis supplied.

[8]The federal waiver provides:

"Before we ask you any questions, you must understand your rights.

"You have the right to remain silent.

"Anything you say can be used against you in court.

"You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

"If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

"If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

### WAIVER OF RIGHTS

"I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

It is apparently appellants' contention that this sentence precluded the warning from being valid. It will be noted, however, that appellants were advised that they could remain silent; that anything they said could be used against them in court; that they had the right to talk to a lawyer *before being asked any questions,* and the right to have that lawyer with them during questioning. They could not have been more clearly told that they had the right to refuse to make any statements whatsoever.

It is asserted that error was committed by using a witness whose name had not been listed as one who would testify for the state. This allegation has reference to the testimony of Lawrence Dinger. On January 24, the court had directed the prosecuting attorney to advise appellants of witnesses that he planned to use, but according to the state, it was not known at that time that Dinger would be a witness, and the prosecuting attorney subsequently stated (at a hearing on a motion for new trial) that counsel were notified of any new witnesses as soon as they were known, or subpoenaed by the state. Ark. Stat. Ann. § 43-1004 (Repl. 1964) requires that the names of all witnesses, who were examined prior to the finding of an indictment, should be written on the indictment. In *Baker* v. *State,* 215 Ark. 851, 223 S.W. 2d 809, we held that, assuming, though without deciding, that this provision is applicable to informations, the requirement is merely directory. It might be pointed out that, though a continuance was asked for on other grounds (not argued as reversible error), no statement of surprise was made by defense counsel, nor any motion made for a continuance, when Dinger was called to the witness stand. It is also argued that defendants' counsel was unable to obtain any information from the federal officers with regard to the testimony they would present at the trial. On the day of trial, an oral motion was made to strike all witnesses who were not listed in the bill of particulars, and to exclude all F.B.I. and state reports. The court overruled

the motion, but stated that it would give counsel all the time required to talk to any and all witnesses prior to their testifying. The prosecuting attorney was also directed to furnish counsel with a copy of any reports that he planned to introduce. It is argued that the Jencks Act, 18 U.S.C.A., Section 3500, was violated. In the first place, that act only applies to criminal prosecutions brought by the United States, and in the next place, there is no requirement that the statement of any witness called by the government be given counsel for defense until after that witness has testified on direct examination.

It is asserted that the trial court did not admonish the jury that the statements of Bradshaw could not be considered as against Doris Steel, and did not grant a severance, and these omissions constituted error. The simple answer to these assertions is that no request for either action was made by the defense.

It is argued that the court erred in not granting a motion which was made for a change of venue. The basis for this motion was three newspaper articles, relative to the robbery, two appearing in the DeQueen Bee, a weekly paper published in Sevier County, and the other being published in the DeQueen Daily Citizen. The first story complained about was published on Thursday, September 28, 1967, and is an account of the bank robbery. There is also a picture taken at the bank of the suspects, just prior to their interrogation by officers. The article is simply a news item, and recites that appellants were being questioned in connection with the robbery. It will be noted that this issue was published some seven months before the trial. The Thursday, October 5, 1967, issue of the paper merely recited that these three appellants had entered pleas of not guilty, and that each had been released on a $5,000.00 bond. None of the evidence was recited except the fact that the stolen Ford had been found abandoned. The third newspaper offered in evidence was the April

24, 1968, copy of the Daily Citizen, which was published five days before the trial. The article itself was very brief, reciting that appellants would be tried on Monday, and listed the names of the jurors for the adjourned February term of court. However, one sentence read as follows:

"All four had entered guilty pleas and were free on $5,000.00 bond each."

Obviously a typographical error had been made, and the sentence should have read, "All four had entered *not* guilty pleas." This is the only statement that could at all have had any adverse effect, and certainly any member of the jury learned at the very outset of the case, that no plea of guilty had been entered. Neither affidavits nor testimony was offered that appellants could not receive a fair trial, nor does the record reflect that members of the jury panel were questioned with regard to whether the newspaper articles had influenced them in any manner. In other words, there is absolutely no showing of any possible prejudice.

In June, 1968, a hearing was held on an amended motion for a new trial, wherein it was asserted that new evidence had been discovered that would impeach the evidence offered by Lawrence Dinger on behalf of the state; William Allen testified on behalf of the appellants, the substance of his testimony being that Steel did not make any statement to him about buried money, nor the Lockesburg bank. Allen said that there was a conversation about money, but it concerned a shotgun. In *Gross* v. *State*, 242 Ark. 142, 412 S.W. 2d 279, this court mentioned that newly discovered evidence is one of the least favored grounds of a motion for new trial, and that such motion is addressed to the sound legal discretion of the trial judge. It was further pointed out that the mere fact that the evidence is contrary to that offered at the trial by the state is insufficient, and that it must be shown that, because of this evidence, a different

result upon a new trial is probable. We said that in order to justify the granting of the motion, the evidence in support thereof should be clear and satisfactory, and the trial court's action should not be disturbed unless it is manifest that an injustice has been done. After studying this testimony carefully, we are not persuaded that the trial court abused its discretion, and this feeling is strengthened by the fact that no request for a continuance was made when Dinger was called to testify.

Other alleged errors during the trial are mentioned, including some alleged errors that do not appear in the record. We, of course, have given no consideration to the last mentioned, but every alleged error which appears in the transcript has been examined, and found to be without merit.

Affirmed.