Charles P. OULETTA, Petitioner,

v.

Charles Robert SARVER, Commissioner of Corrections, State of Arkansas, and Ted Hood, Surety, Respondents.

No. LR–70–C–7.

United States District Court
E. D. Arkansas, W. D.

Jan. 30, 1970.

James L. Sloan and H. Allan Dishongh, Little Rock, Ark., for petitioner.

Don Langston and Mike Wilson, Asst. Attys. Gen., State of Arkansas, Little Rock, Ark., for respondents.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

In this habeas corpus case petitioner, Charles P. Ouletta, challenges the federal constitutional validity of his 1968 conviction in the Circuit Court of Saline County, Arkansas, on numerous charges of forgery and uttering. He contends that in the course of his trial there was improperly admitted into evidence an incriminating statement made by him to a bank examiner employed by the Federal Deposit Insurance Corporation (FDIC) without having received the warnings as to his Fifth and Sixth Amendment rights said to have been required by the holding of the Supreme Court of the United States in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. No other question is raised by the petition.

Respondents, actually the State of Arkansas, do not contend that *Miranda* warnings were given; their position is that in the circumstances no such warnings were required.

The cause has been tried to the Court and has been submitted on the transcript of the trial in the Circuit Court, oral testimony, documentary evidence, oral statements of counsel, and informal memorandum briefs.

The Benton State Bank of Benton, Saline County, Arkansas, is a bank chartered under Arkansas law; its deposits were and are insured by the FDIC, an agency of the United States. During times here pertinent its president was W. R. Alsobrook, and its vice president was W. A. Springer.

Petitioner, a resident of North Little Rock, Arkansas, has been engaged for many years in the construction business. In the decade of the fifties and extending down to the fall of 1967 he was undertaking to construct residential housing in certain subdivisions in Saline County. His venture was highly speculative and ultimately unsuccessful.

Petitioner's Saline County operations were financed by the Benton State Bank, at which he dealt largely with Messrs. Alsobrook and Springer. By November 1967 petitioner was very heavily obligated to the Bank with the obligations ostensibly being secured by notes and mortgages covering Saline County real estate. The extent of those obligations was more than $900,000 whereas the limit of credit that the Bank was permitted by law to extend to petitioner did not exceed some $200,000. Not only were the obligations excessive; they were also in default.

Around the first of November 1967 a team of FDIC examiners, headed by

Fred H. Caudle, an examiner of 30 years' experience, commenced a routine examination of the affairs of the Bank. They observed a large number of notes and mortgages setting out the same address for the purported borrowers, and they observed that the signatures on the documents were apparently in the same handwriting.

The examiners associated the notes and mortgages just mentioned with Mr. Ouletta, and Mr. Caudle questioned him about them. He at first declined to give any information, but on November 15, 1967, he appeared at the Bank voluntarily and had an interview with Mr. Caudle in the office of Mr. Alsobrook.

In the course of that interview Ouletta identified large numbers of notes and mortgages signed with the names of fictitious persons. Those spurious obligations were listed on three sheets of paper. The statement here in question amounts to an introduction to that list and is as follows:

"The names on the following loans are of persons that do not exist and that I signed the names without nobody other than myself knowing this."

The statement was signed by petitioner, and he also verified each page of the list with his signature.

In the spring of 1968 the Prosecuting Attorney of Saline County filed criminal informations against petitioner charging the forgery of documents and the uttering of them to the Bank. Petitioner pleaded not guilty to the charges, and they were consolidated for purposes of trial. Petitioner, who was represented by capable counsel of his own choice, waived trial by jury, and the consolidated cases were tried before Circuit Judge William J. Kirby of Little Rock,

sitting in Saline County on exchange of Circuits.

The Circuit Court heard the testimony of various witnesses for the State, including Messrs. Caudle, Alsobrook, and Springer. Petitioner testified in his own behalf. In the course of the testimony of Mr. Caudle, the trial judge admitted into evidence, over the objection of petitioner, the statement that has been quoted along with its accompanying list of fictitious securities.

At the conclusion of the trial Judge Kirby without elaboration found the defendant guilty. The Judge then proceeded to sentence petitioner to imprisonment for ten years on each count of each of the 128 informations filed against him. However, it was provided that the sentences should all run concurrently.

 Petitioner appealed his conviction to the Supreme Court of Arkansas where it was affirmed. Ouletta v. State, 246 Ark. 1112, 442 S.W.2d 216. That Court specifically considered and rejected petitioner's contention based on *Miranda*.[1] Hence, at least as far as the *Miranda* claim is concerned, the exhaustion of State remedies requirement of 28 U.S.C.A. § 2254, has been satisfied.

In order to get the contentions of the parties into proper perspective it is necessary, first, to examine the statement and its contents in connection with the specific charges filed against petitioner in the Circuit Court, the theory and strategy of the defense, the contentions advanced in the Supreme Court of Arkansas, and the approach of that Court to the questions presented to it.

Each of the informations filed against Ouletta contained two counts. The first count of each charged a forgery of an instrument; the second count of each

[1]. During the entire course of the State court proceedings petitioner was permitted to remain at large on bail; he was still on bail when the instant petition was filed, but his surrender by his surety, respondent Hood, and his incarceration by respondent Commissioner of Corrections were imminent. In the circum-

stances the Court entertained the petition without requiring petitioner to yield himself into actual custody of the Sheriff or the Commissioner and entered an order which in effect permitting petitioner to remain on his existing bond pending disposition of this case.

charged an uttering of it. It is not clear whether the forgery counts were based on Ark.Stats. § 41–1803 or whether they were based on Ark.Stats. § 41–1805; it would appear that the uttering counts were based on the statute last mentioned. In any event, there is no question that intent to defraud was an essential element of the offenses charged in all of the counts, and each count alleged that the defendant acted with intent to defraud the Bank.

Apart from the list of fictitious names appended to petitioner's statement to Mr. Caudle, the statement itself may be divided into two parts. The first part is to the effect that the names signed to the instruments were fictitious and that the names had been signed by petitioner. The second part was that no one but petitioner knew anything about the fictitious nature of the signatures.

Had the statement consisted of the first part only, petitioner probably would not even have objected to its introduction at the trial. Petitioner has never denied that the listed loans were in the names of fictitious people or that he signed the documents. Indeed, at an early stage of the trial and before any witness had been called, counsel for petitioner stipulated in open court and in the presence of petitioner that petitioner had signed fictitious names to the documents referred to in the informations, that the documents had been negotiated to the Bank, that in general the proceeds of the loans were deposited in petitioner's bank account but that in instances petitioner had received cash from the Bank.

The defense theory was that petitioner had no intention to defraud the Bank, that he did not deceive the responsible officers of the Bank with whom he dealt, that they either knew or very strongly suspected that from about 1964 on the security instruments submitted to the Bank by petitioner were fictitious, and even that they may have encouraged or indeed instigated the submission of such instruments.

With respect to that theory the Supreme Court of Arkansas had this to say (pp. 216–217 of 442 S.W.2d):

"We first consider Ouletta's contention that he should have been acquitted, for insufficiency of the State's evidence. It is insisted that the bank's officers knew the signatures to be fictitious and that therefore Ouletta was not shown to have had the necessary intent to defraud.

"That issue involved a question of fact about which the testimony was in conflict. Ouletta usually dealt with W. A. Springer, formerly a vice-president of the bank. Springer testified that he regularly checked on the progress of Ouletta's houses when Ouletta first began business. After several years, however, Springer came to have confidence in Ouletta and discontinued any attempt to verify the notes and mortgages that he brought to the bank. Springer testified that he had no idea that the instruments were forgeries. W. R. Alsobrook, president of the bank, corroborated Springer's testimony.

"Ouletta, testifying in his own defense, maintained in substance that his financial condition had deteriorated to such an extent that the bankers must have known that the instruments were not genuine. When, however, Ouletta was asked point-blank by his own attorney whether he said anything to Mr. Springer about the use of fictitious names on the notes, his reply was evasive: 'Well, I might have. I probably did say that they probably were fictitious, to which he probably got the idea.' Thus the issue was essentially one of credibility, upon which the trial court's finding is conclusive."

It is in connection with that theory that the second portion of the challenged statement becomes significant because petitioner's admission that no one but himself knew what he had been doing was directly contrary to his theory and testimony that the bank officials knew

or were charged with knowledge that the signatures on the documents were fictitious and had been written by petitioner.

Thus, under defendant's theory of the case the second part of the statement was incriminating whereas the first part was not necessarily so. Additionally, since the second part of the statement conflicted with petitioner's testimony at the trial, it raised a question as to his credibility as a witness.

■ In finding the defendant guilty the trial court made no specific findings of fact; it simply made a general finding of guilt. This Court does not know what effect the second portion of the statement had on the mind of the Circuit Judge and cannot say whether in the absence of that portion the defendant would have been found guilty. In such circumstances any *Miranda* error that the Circuit Court may have made in receiving the statement cannot be dismissed as harmless under the test laid down in cases like Anderson v. Nelson, 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81; Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; and Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171.

This brings the Court down to the *Miranda* question proper. It is the position of petitioner that when he was interviewed by Caudle the investigation of the affairs of the Bank had reached the "accusatory stage," that he was the suspect under investigation, and that *Miranda* warnings were required. The position of respondents is that the investigation had not reached the accusatory stage, that petitioner was not in custody, that his statement was purely voluntary, and that no warnings or cautions from Mr. Caudle were required by *Miranda* or by the earlier case of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977.

In rejecting petitioner's *Miranda* argument the Arkansas Supreme Court stated (p. 217 of 442 S.W.2d):

"That argument is not sound. Counsel rely upon two cases: United States v. Wainwright, 284 F.Supp. 129 (D.C. Colo.1968), and United States v. Turzynski, 268 F.Supp. 847 (D.C.Ill.1967). In those cases it was held that a taxpayer should be warned of his rights before being interrogated about his income tax returns by the Intelligence Division of the Internal Revenue Service. In both cases, however, it was pointed out that a tax matter is not referred to the Intelligence Division until there is reason to believe that the taxpayer has committed a crime. The jurisdiction of the Intelligence Division is limited to criminal matters. Thus those cases merely followed Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), in holding that the warning must be given when an investigation reaches the accusatory stage.

"That was not the case here. Caudle testified that he was not a member of any law enforcement agency. In making his examination of the bank he noticed the similarity of handwriting on the notes and asked Ouletta to come in, because his name and address were on the documents. According to Caudle, Ouletta came to the bank voluntarily and signed the statement in the course of a conversation about the documents. It cannot be said that Ouletta was in custody or was deprived of his freedom of action in any way. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). The trial court correctly admitted in evidence Caudle's testimony and the statement signed by Ouletta."

■ While the considered judgment of the Supreme Court of Arkansas is entitled to weight in this proceeding, this Court in the last analysis must exercise its own independent judgment; it is not bound by the State Court's decision, nor confined in its inquiry to undisputed facts, nor is it limited necessarily to a consideration of only the evidence before

the Circuit Court and the Arkansas Supreme Court. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770.

The *Miranda* case, decided in 1966, adhered to and elaborated upon the earlier decision of the Court in *Escobedo*. In a capsule, *Miranda* holds that when an investigation ceases to be simply a general investigation of an unsolved crime and reaches the "accusatory stage" at which it is centered upon a particular suspect, and where that suspect is in custody or is in a situation in which his freedom of action is substantially restrained, our adversary system of justice goes into operation and it becomes the constitutional duty of the interrogators before questioning the suspect to give him detailed warnings of his constitutional rights and of the consequences of making statements whether culpatory or exculpatory. As has been seen, no contention is here made that Mr. Caudle gave any warnings or cautions to petitioner, and the question is whether such warnings or cautions were required.

■ By its own terms *Miranda* is limited to a situation in which a suspect about to be questioned is in custody or has had his freedom of action significantly restrained by investigating officers. The aim of *Miranda* is to eliminate or mitigate real or supposed police abuses in the course of *in camera* interrogations of suspects. While "white collar criminals" are entitled to the protection of *Miranda* in proper cases, it would seem obvious that the police abuses against which *Miranda* is directed are less likely to be practiced upon them than upon "ordinary criminals," many of whom are young, inexperienced, ignorant, or poor, or are members of minority racial or ethnic groups.

■ Regardless of whether by November 15 Mr. Caudle suspected that

petitioner, as a specific individual, had probably committed a crime against the Bank, the Court finds that petitioner was not in custody when he made his statement, that his liberty had not been significantly restrained in any way, that Mr. Caudle did not deceive or coerce petitioner or exert any pressure upon him to make the statement, and that the statement was completely voluntary. And the Court concludes that in the circumstances no *Miranda* warnings were required.

As stated, petitioner at first refused to give Caudle any information. Upon that refusal Caudle undertook personally to locate the people whose purported signatures appeared on the notes and mortgages; of course, those efforts were not successful.[2]

In the interim between Caudle's first conversation with petitioner and November 15 when the statement was given petitioner had undergone a change of heart and had decided to cooperate, at least to some extent, with the investigation of the Bank's affairs.

That change of heart was not due to anything done or said by Mr. Caudle. It was due to the fact that petitioner's conscience was hurting him to the extent that he had conferred with his priest who had advised him to make a disclosure. It was also due to the fact that Mr. Alsobrook was putting pressure on petitioner to cooperate in the investigation, and, according to petitioner, had led him to believe that if he would cooperate and would keep the Bank and its officers out of difficulty, he would not be prosecuted. For those reasons he went to the Bank, gave the information and signed the statement.

Petitioner contends that the second portion of the statement was the product of Mr. Caudle's own mind and was not

2. On the morning of November 15 before petitioner appeared at the Bank Caudle had telephoned the office of the F.B.I. in Little Rock and requested assistance in locating the supposed signers of the documents. An agent was dispatched to Benton, but at the time he got there petitioner had appeared and was in conference with Caudle. There is nothing to indicate that petitioner knew that the agent was at the Bank, and he was never questioned by the agent; Caudle did not see the agent until petitioner had left the Bank.

based on anything said or done by petitioner, and that when he signed the statement, he did not realize that it contained the second portion. The Court does not accept his testimony along those lines.

Petitioner also testified that if he had known that the statement was incriminating and could be used against him he would not have signed it and would have consulted an attorney. As to that testimony, the Court will say first that it indicates that petitioner knew that he was not required to give any statement and that he did not consider himself in custody or restrained in his freedom of action.

Apart from that, the Court is satisfied that petitioner in fact knew that the statement was potentially incriminating and could be used against him if he was prosecuted. Petitioner is a man of mature years; he is not naive; he has been for many years engaged in rather extensive business activity. Any man of common sense and with petitioner's business experience is bound to know that people do not go about negotiating thousands of dollars worth of spurious securities to banks without probably violating at least some law, regardless of the ultimate subjective purity of their motives.

As the Court sees it, petitioner knew that the statement *could* be used against him; he simply believed or hoped on the strength of the alleged assurances of Alsobrook that he would not be prosecuted and that the statement *would* not be used against him.

The situation of petitioner vis-a-vis Caudle is analogous to the situation in which an income tax payer finds himself when he is being interviewed by agents of the Treasury Department in the course of a tax investigation. The Court of Appeals for this Circuit has held recently that if the taxpayer is not in custody or in seriously coercive circumstances imposed by the agents while being interviewed, and if the agents do not deceive or mislead the taxpayer, there

is no constitutional requirement that Miranda warnings be given. Cohen v. United States, 8 Cir., 405 F.2d. 34; see also White v. United States, 8 Cir., 395 F.2d 170. Without going so far as to push the analogy just mentioned to the point of saying that *Cohen* is directly in point, the Court finds the holding instructive in this case.

A judgment will be entered dismissing the petition with prejudice.