Alan Wayne ROUW *v.* STATE of Arkansas

CR 79-15                                          581 S.W. 2d 313

Opinion delivered May 21, 1979
(In Banc)

*Buford Gardner,* for appellant.

*Steve Clark,* Atty. Gen., by: *E. Alvin Schay,* Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. Alan Wayne Rouw, a juvenile, was found to be a delinquent, having committed the crime of manslaughter. He was ordered committed to the Arkansas State Training School by the Circuit Court of Carroll County.

On appeal Rouw alleges six errors. We find no merit to any of these arguments except those relating to statements made by Rouw to law enforcement officers. Those statements, we find, were not voluntary as defined by the law and they should not have been admitted into evidence against Rouw. For that reason the judgment of the circuit court is reversed and the cause is remanded.

The tragic incident precipitating the charge was a shooting of Lisa Evans, age thirteen, a neighbor and schoolmate of Rouw's. She was found dead in her living room by her mother on the afternoon of October 13, 1977. The autopsy showed a single gunshot wound to her head.

The sheriff's office conducted an investigation of the incident and questioned Rouw about his whereabouts on that day. He had been seen near the Evans home carrying what appeared to be a rifle. He admitted that he had gone hunting that day in nearby woods but denied that he was at the Evans

home or knew anything about the shooting. The gun that he had carried, a .22 caliber rifle, was shown to the officers.

The next day a deputy sheriff walked with Rouw the route he claimed to have taken when he was hunting. No shells were found where Rouw claimed he had stopped to shoot at some buzzards. A few days later, on the 18th of October, the sheriff ordered Rouw brought in.

A deputy sheriff, C. W. Elrod, picked up Rouw at his home and brought him to the sheriff's office. Elrod later testified that Rouw had made a voluntary statement to him en route to the sheriff's office in which he admitted shooting Lisa Evans. The next day, the 19th of October, the sheriff took a statement from Rouw at about 11:00 a.m. On October 20, an investigator for the Benton County Sheriff's Department took a statement from Rouw. These statements were all admitted into evidence against the objection of the defendant and we agree that they should not have been admitted.

Legally, these statements were confessions and it is a rule of law that in making such a confession, one must voluntarily, knowingly and intelligently waive his right to remain silent before it can be admitted against him. *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The test for determining whether such statements are voluntary is that on appeal we examine the totality of the circumstances related to the statements, *Harris* v. *State,* 244 Ark. 314, 425 S.W. 2d 293 (1968), and will affirm the trial court's finding unless it is clearly against the preponderance of the evidence. *Degler* v. *State,* 257 Ark. 388, 517 S.W. 2d 515 (1974).

In this case Rouw was a minor, age 14 years and 11 months at the time the statements were taken. While youth alone is not a circumstance that will prevent a voluntary confession or a knowing waiver of constitutional rights, it is a factor to be considered. *Mosely* v. *State,* 246 Ark. 358, 438 S.W. 2d 311 (1966). Neither parent signed a waiver of rights form or testified they were so advised. The fact that the parents have not been advised of the rights of the child prior to questioning is also a factor to be considered. The statements in question here were taken over a period of three days while

Rouw was in "protective custody." The length of the interrogation is a factor. *Vaughn & Wilkins* v. *State,* 252 Ark. 505, 479 S.W. 2d 873 (1972). The sheriff ordered Rouw in for questioning; his parents were advised that they were holding him for "protective custody." Deception by any official alone will not invalidate an otherwise voluntary confession, but it also is a factor to be considered. *Dewein* v. *State,* 114 Ark. 472, 170 S.W. 582 (1914).

It was not disputed that none of the provisions of the Arkansas Juvenile Code, Ark. Stat. Ann. § 45-501, et seq. (Repl. 1977), were complied with. Rouw remained in the county jail for 20 days. He was not immediately taken before juvenile court; his rights were not explained to him until the day after he was taken into custody when he signed a rights form just prior to giving a statement to the sheriff; and, there was no evidence presented by the State that he was ever served with a copy of a petition or summons regarding the charge. In fact, the circuit court reversed the first hearing on this matter because he had not been served a copy of the petition. Even though we do not agree with appellant's contention that statutory noncompliance is alone grounds for suppression of the statements, we hold that the State's failure to comply with the provisions of the Juvenile Code is another factor to be considered in reviewing the totality of the circumstances.[1]

The sheriff admitted that Rouw became a suspect at the time he accompanied the deputy sheriff to the woods to look for spent shells. It is not disputed that Rouw was not informed that he was a suspect. The sheriff testified he was brought in for "questioning," yet he was not informed of his rights until October 19 immediately before a statement was taken from him. The sheriff admitted that Rouw was scared and broke down once or twice when they were talking to him.

Defense counsel questioned the sheriff about whether Rouw had refused to sign a rights form when he was brought

---

[1]In some jurisdictions, statements have been held inadmissible solely because they were obtained in violation of similar statutes. See *State* v. *Shaw,* 93 Ariz. 40, 378 P. 2d 487 (1963); *State* v. *Arbeiter,* 408 S.W. 2d 26 (Mo. 1966).

in; his answers to those questions are as follows:

. . .

A. Sir, when he was booked in, it shows where — it shows booked in, the time was 7:15 P.M. I believe. This was probably a little bit earlier than that, that he was brought in.

Q. Alright. Was he booked before or after you had your conversation with him?

A. I don't recall, sir. I would say we were — I probably had a conversation with him, we had a conversation all during the time from the time he came into the S.O., [sheriff's office] so it's hard for me to say.

Q. Did you give him one of those rights forms to fill out that evening?

A. I don't believe so, sir.

Q. Isn't it a fact that he was given a rights form and he refused to sign it?

A. I could not honestly answer that.

Q. You don't recall that either?

A. I'm not positive. He possibly could have. I wouldn't deny it. I don't know, sir, I can't recall.

. . . .

The sheriff's answers to questions about exactly what Rouw was informed of when he was considered a suspect are as follows:

. . .

Q. Alright. Now, when did he become a suspect?

A. I believe, in my opinion when he became a suspect was when — it was probably at the time we walked back with him on his route that he indicated to us that he had went up to the tree where he claimed he shot into a squirrel's nest and of course, along with the other conversations we had had with neighbors down the road.

Q. At the time he became a suspect did you advise him of his rights at that time?

A. He wasn't in custody.

Q. Did you advise him of — my question is: did you advise him of his rights?

A. No, sir.

Q. Alright. You had other conversations with him after that?

A. Yes.

Q. After he had become a suspect you had other conversations with him?

A. Yes.

Q. Did you advise him before those conversations of his rights?

A. No, sir.

. . . .

Deputy Sheriff Elrod testified that after he picked up Rouw at his parents' home, and on the way to the sheriff's office, Rouw told him that he had shot the girl. Elrod did not testify at either of two other hearings in this matter. The deputy sheriff said it was "voluntary." The deputy sheriff admitted that he did not at any time ever advise Rouw of his rights. The day after the first statement taken by the sheriff, which would have been the 20th, Rouw was to have taken a polygraph test to be administered by an investigator for the

Benton County Sheriff's Department. His father signed a form to give permission but he was not advised of his son's rights before taking the polygraph. After Rouw was in the room with the officer, according to the officer, Rouw decided to make a statement at which time he was given a rights form which he signed. Rouw's father was outside the room and was not consulted. A statement was taken from Rouw, and the polygraph was never administered.

It is the burden of the state to prove that a person voluntarily and knowingly waives his constitutional rights. *Miranda* v. *Arizona, supra.*

When all of the circumstances are considered in this case, there is no doubt that the State did not satisfy its burden. His parents were told he would be taken in for protective custody. He was questioned that evening and perhaps the next day before he made a statement which was recorded. At no time that evening or the next morning before 11:00 a.m. was he advised of his rights. This is admitted. There is no written evidence that his parents were advised of his rights. None of the provisions of Arkansas law regarding treatment of juveniles were complied with.

In a similar case where a voluntary statement was made to a policeman in the presence of a third person, it was held that the confession was admissible. *Little* v. *State,* 261 Ark. 859, 554 S.W. 2d 323 (1977). However, in that case the deputy sheriff testified he advised the minor of her rights when she got into the vehicle. Furthermore, the minor was aware that she was a suspect and was charged with a killing. Neither of these circumstances exist in this case.

Here, the sheriff admitted that Rouw was questioned before he was advised of his rights, a clear violation of the spirit of *Miranda.* The only evidence at all that he knew that he was waiving his rights is a form that contained his signature which was signed the next day.

His parents disputed they were ever advised that he would need a lawyer or could make bond. They said they inquired about both of the sheriff but received evasive answers. His mother testified that she had instructed the sheriff not to

pick him up at school or on his way home from school, and that it was her understanding that he was being taken in solely for the purpose of protective custody. Neither of his parents ever acknowledged in writing that they knew he was a suspect or being questioned until after the statements had been taken.

We conclude that the statements taken do not meet the constitutional test as set forth in *Miranda* or other related decisions and, therefore, these statements cannot stand as voluntary confessions and may not be admitted against this defendant.

We find no error in the court's commitment of Rouw to the Arkansas State Training School Department pursuant to Ark. Stat. Ann. § 45-402 (Repl. 1977).

The other errors alleged are without merit or will not likely recur on a new trial; for that reason they are not discussed.

Reversed and remanded.

GEORGE ROSE SMITH, FOGLEMAN and BYRD, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I cannot accept the majority's finding that, in spite of the trial court's holding to the contrary, every statement made by appellant was involuntary. This overextension of the *Miranda* principles is quite unwarranted. In my opinion, the trial court's findings as to some of the statements, at least, are supported by a clear preponderance of the evidence. Perhaps the matter would be in better focus if the facts were viewed chronogically.

On the day Lisa was found dead in her home, Alan Rouw was seen going toward the Evans house at a point approximately halfway between his own home and the Evans house. He was carrying a weapon that looked like a rifle. This was approximately 1-1/2 hours prior to the time she was found dead at 5:30 p.m. Later he was seen going toward his own home, still carrying a rifle. When he arrived at home about 5:00 p.m., he appeared to be upset and hurried to put

his gun away. After Alan got home, the sheriff came to the Rouw house and told the Rouws that Lisa was dead. There was some conversation at that time to the effect that Alan had gone hunting, had passed through an orchard, found a dead cow, made some shots at a buzzard, passed the Smith house (which was half way between the Rouw house and the Evans house) and had then shot at a squirrel's nest. The sheriff and some of his deputies returned the next day and asked if it would be all right for Alan to show them where he had been, without indicating that Alan might have had anything to do with Lisa's death. Alan went along to show the places he had gone. A search was made at the place he said he had fired at a buzzard, but no empty hulls were found. No empty cases were found near a tree where Alan indicated that he had shot into a squirrel's nest. Later that day the sheriff returned to the Rouw house and asked to see the weapon Alan had taken hunting. It was given to him by the boy's father, Marvin Rouw. The officers also obtained some shells and fired a test shot into a car seat. A deputy sheriff had been dispatched through the area to talk to the people who lived there.

An autopsy was performed on October 14th. It disclosed that the death of the little girl was caused by a gunshot wound located behind her left ear. Bullet fragments were removed. The pathologist who performed the autopsy said that the bullet was small caliber. He said that the wound could have been consistent with a larger caliber bullet.

There was no further contact between the officers and the Rouws until October 18th, when Sheriff Jerry Colvin called the Rouw home and told Alan's mother that he wanted to pick Alan up at school and ask him some more questions. Mrs. Rouw said that she preferred that the sheriff not ask Alan questions or pick him up at school. The sheriff then asked if it would be all right to pick Alan up before he got on the school bus. When Mrs. Rouw refused to give her permission, the sheriff asked if it would be all right to pick Alan up when he got off the bus, and Mrs. Rouw said no. She told the sheriff if he was going to pick him up, to pick him up at home. The sheriff sent his deputy, C.W. Elrod, to pick Alan up. Elrod went to the Rouw home and, after sitting down and talking with Mrs. Rouw and one of Alan's sisters, Alan got in the car with Elrod and they started down the road en route to the

sheriff's office. Alan seemed rather quiet. After Elrod had driven a short way, Alan asked Elrod if he knew who killed Lisa. Elrod said, "I believe I do." After Elrod had driven about 300 yards further, Alan asked, "How do you know who killed Lisa?" Elrod responded, "Well, that's part of our job." After Elrod had driven a little further, Alan said, "Well, I got something to tell you. I was at the house and I did shoot her." Elrod said that he told Alan not to say any more and proceeded to the sheriff's office where, upon arrival at approximately 5:30 p.m., he told the sheriff what Alan had said.

There was no interrogation whatever. There has never before been any exclusionary rule that renders evidence of such statements inadmissible and I cannot join in any such unwarranted extension of *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 ALR 3d 974 (1966). A statement that is spontaneous, voluntary and unsolicited, made by one who is not being interrogated at the time, is admissible. *Steel* v. *State,* 246 Ark. 75, 436 S.W. 2d 800; *Crawford* v. *State,* 254 Ark. 253, 492 S.W. 2d 900; *Reynolds* v. *State,* 254 Ark. 1007, 497 S.W. 2d 275; *Upton* v. *State,* 257 Ark. 424, 516 S.W. 2d 904; *Sanders* v. *State,* 259 Ark. 329, 532 S.W. 2d 752; *Little* v. *State,* 261 Ark. 859, 554 S.W. 2d 312. The exclusionary rule was developed as a deterrent to police coercion, but this is simply not the sort of police conduct which was intended to be inhibited by *Miranda* and its progeny. See *Ouletta* v. *Sarver,* 307 F.S. 1099 (E.D. Ark., 1970), aff'd. 428 F.2d 804 (8th Cir., 1970). Police officers are not required to gag an accused who wants to confess or make incriminating statements. Statements which do not result from in-custody interrogation are not barred. *Johnson* v. *State,* 252 Ark. 1113, 482 S.W. 2d 600. It is just such misapplications of the *Miranda* rule as that being made here that have caused such great dissatisfaction, both public and judicial, with the exclusionary rule. See, e.g., *Bivens* v. *Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), Burger, C.J., dissenting; *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), Burger, C.J., dissenting.

Elrod reported Alan's statements to Sheriff Colvin. Colvin and Elrod talked with Alan that night for a short while. No significant statement was made by him except for a repetition of what he had said to Elrod. Alan was not warned

about his right to remain silent or right to counsel at that time, and he was certainly in custody. When the officers asked him if he wanted to say anything, he responded to Elrod, "No, not in front of all these people. I don't want to tell anyone but you. You're the only one I trust." Elrod asked if it would be all right for the sheriff to stay and Alan said, "Sure, that would be fine." All the other deputy sheriffs left and Alan repeated what he had told Elrod. The only thing he said that was not virtually identical to his remarks to Elrod was the staement that he had been telling a story about going squirrel hunting. Alan said that he wanted his mother to be there with him and she was called. According to Elrod, while they were awaiting Alan's mother's arrival, Alan stated, without being questioned by anyone, that he shot Lisa.

Mrs. Rouw said that she became suspicious when the phone rang, because the officers had not told her that Alan would be kept in custody. The Rouws went to the sheriff's office after the call was received.

Elrod testified that the officers had received a call from a young man who had stated that his brother was carrying a gun and that he was going to kill the persons that killed Lisa, if he found them. The officers had gone to the school and talked to the caller's brother on the 17th. When Mrs. Rouw arrived at the sheriff's office, she was made aware that threats had been made against the person or persons who killed Lisa. As a result of a discussion of the matter, Alan was held in custody. The officers called it protective custody, but he was "booked in" at 7:15 p.m. on "suspicion of homicide." Sheriff Colvin believed that he had so advised Mrs. Rouw, but he did tell her that Alan was being held in protective custody. Colvin said that the matter of protective custody was discussed at great length. Elrod said that it was discussed at length. Mrs. Rouw confirmed the officers' testimony that it was agreed that Alan be held in custody because of the indications that there had been threats of violence. Although Mrs. Rouw said that Alan told her they had already "taped him," the sheriff said that the officers had not taken any statements down that night, and he could not recall having any tape recorders in the room at that time. No tape recording of these conversations was ever produced or mentioned, except by Mrs. Rouw. The sheriff said that he had none.

On the following day, Alan was interrogated by the officers at 11:00 a.m. in the coffee room at the sheriff's office. The deputy prosecuting attorney and the sheriff were present. Alan was advised of his rights. The sheriff produced a "rights form," said that Alan read it himself, that it was read to him, that he was made aware of his rights, and that he signed it in the presence of the sheriff and the deputy prosecuting attorney. Alan then made a full confession that was recorded on tape and the tape was played at the trial, but the recording was not transcribed in the record. The sheriff said that Alan appeared a little scared, and he expressed the belief that Alan did "break down" once, or possibly twice, during this interview. Mrs. Rouw said that the sheriff told her after this statement had been taken, that they had gotten the statement they needed, with what they had gotten the night before.

On the next day, October 20th, Alan was taken to the Benton County jail for a polygraph examination. His father was present at the place where the test was to be given. Alan had shown some hesitancy about taking the test, and the sheriff tried to explain to the boy and his parents how the polygraph operated. Colvin said that the parents agreed to the examination before Alan, accompanied by his father, was taken to Bentonville. Marvin Rouw confirmed the fact that he agreed to the polygraph examination, but said that no one explained that they would take a statement. Yet, as abstracted by appellant, he testified:

> We went to find out exactly what had happened. The sheriff asked if it would be alright. We were willing to do that because, as far as we were concerned, it was an accident and they just wanted to hear what they wanted to hear, or they wanted to hear the truth. That was up to them.

Even though Marvin Rouw admitted that the officers explained to Alan the manner in which the polygraph examination would be administered, he said that it was not explained to him. Mr. Rouw admitted, however, that he was told that Alan would be asked a series of questions during the polygraph examination, pertaining to school and the death of

Lisa Evans, and that the main purpose was "to determine the truth of the death of Lisa."

Don Rystrom, the polygraph examiner for the Benton County sheriff's office, testified that, before interviewing Alan Rouw, he advised Alan of his rights. Rystrom exhibited a waiver signed by Alan, Colvin, and Rystrom. This instrument contained a statement of rights, which Rystrom said he read to Alan. Rystrom said that he also talked with Alan's father, and that he "agreed with it." Rystrom exhibited "a parent's or guardian's consent for a minor to receive a polygraph test," signed by Marvin Rouw. Sheriff Colvin and Rystrom and Alan also signed a written consent to take the examination. Rystrom said that he advised Alan that he never taped any polygraph examinations. He did not advise Alan's father that he might take a recorded statement from Alan or that the polygraph examination would not be recorded. Rystrom's testimony about the statement taken by him is abstracted, by appellant, as follows:

> After I had explained how it worked, the questions were read to Alan and he indicated to me that he had not told the truth. He wanted to tell me the truth then. He said, "Yes, I have been lying," and I told him I would like to tape a statment and he said, "Fine." I asked if he wanted his father or sheriff Colvin there and he said "no."

> After taking the statement I did not feel it was necessary to take the polygraph due to the circumstances in the investigation.

> It would have taken me about an hour to administer the test. The statement started at 12:45 and ended at 12:54, it took nine minutes. The purpose of the polygraph was to verify Alan's story as to what he had told the officers or his truthfulness and it was determined that he admitted that he had not told the truth.

> I don't know how long we were in the room.

> I haven't noticed any conflicts in the statement that Alan gave me. The story that Alan had told me before

was that the shooting was an accident.

The confession then made was the last evidence obtained from Alan. He had been in custody less than two days.

There was no prolonged or extended interrogation at any time. I cannot understand the emphasis the majority places on the twenty day incarceration. The evidence that the Rouws agreed that Alan be held is overwhelming. The sheriff testified that he had several conversations with the Rouws about holding Alan and that he would not have held him if they had not agreed. He said that Alan's right to make bond was discussed with his parents at length over the twenty days he was in jail and that he advised them of the bond required, but he could not remember the amount at the time of trial. Any questions of credibility on this or any other point were certainly a matter for resolution by the trial court, and we are in no position to say that the judge resolved them incorrectly. It is clear that the parents were notified when any important step was contemplated. The sheriff deferred to Mrs. Rouw's wishes in regard to picking Alan up. Marvin Rouw clearly wanted to ascertain the truth about Alan's involvement as much as the officers did. It is incredible that anyone could say that either of the Rouws would not know the charges on which Alan was held or what he was accused of having done. Marvin testified that he knew Alan was being held in relation to the death of Lisa, but didn't know what the charges were. The parents were allowed to visit Alan in jail, according to Marvin, "very frequently." He said they were turned down only one time, but did not indicate that this was at any critical time, so far as the issues here are concerned. Elrod testified that Alan's parents and sister were able to come see him any time they wanted to, and that they never made any complaint, until the first time Alan came to trial.

Appellant relies heavily upon the language of Ark. Stat. Ann. § 45-418 (Repl. 1977), which states that when any juvenile is arrested, the arresting officer *shall* immediately take the juvenile before the juvenile court. We have held identical language to be directory, but not mandatory. *Patrick* v. *State*, 255 Ark. 10, 498 S.W. 2d 337. I am baffled by the majority's reference to the two principal cases cited by appellant in support of his argument in this respect. In *State* v. *Shaw*, 93

Ariz. 40, 378 P. 2d 487 (1963), the court specifically pointed out that voluntary statements, made during transportation from the scene of arrest or during a period of detention when the statute was not being violated, are admissible in accordance with the usual rules of evidence. In *State* v. *White,* 408 S.W. 2d 31 (Mo., 1966), the court was careful to point out that it did not consider the question of spontaneous statements by a juvenile prior to being taken before the juvenile judge. There simply is no authority that would exclude Alan's statements to Elrod when they were en route to the sheriff's office.

Because I see no sound basis for saying that the trial judge's holding was clearly against the preponderance of the evidence, I could not silently record an unsupported dissent.

I am authorized to state that Mr. Justice George Rose Smith and Mr. Justice Byrd join in this opinion.