## GARNER V. STATE.

### Opinion delivered December 12, 1910.

1. CRIMINAL LAW—ADMISSIBILITY OF CONFESSION OF INFANT.—It was error, in a capital case, to permit the accused, who swore that he was under 14 years of age, to make confession of his guilt, without giving opportunity to his counsel to advise with him and to ascertain whether his confession was made voluntarily. (Page 69.)

2. SAME—REOPENING CASE.—It is within the discretion of the trial court to permit the introduction of further testimony after the case was closed and given to the jury, and before they had delivered their verdict to the court. (Page 71.)

Appeal from Logan Circuit Court, Southern District; *Jeptha H. Evans,* Judge; reversed.

*J. H. Carmichael,* for appellant.

*Hal L. Norwood,* Attorney General, and *Wm. H. Rector,* assistant, for appellee.

The admission of the confession after the case had gone to the jury was within the discretion of the trial court, and this discretion will not be interfered with unless it has been abused. 54 Ark. 124; 34 Ark. 383; 36 Ark. 629; 32 Ark. 585; *Id.* 562; 40 Ark. 511; 62 Ark. 365; 69 Ark. 558; 75 Ark. 325.

KIRBY, J. Appellant was convicted of murder in the first degree on an indictment returned on January 21, 1910, which, omitting the formal parts, is as follows:

"The grand jury of Logan County and Southern District, in the name and by the authority of the State of Arkansas, accuse Will Garner of the crime of murder in the first degree, committed as follows: The said Will Garner, on the 15th day of October, 1909, in the county and district aforesaid, unlawfully, wilfully, feloniously, of his malice aforethought and with premeditation, did kill and murder one Floyd Springer by striking and beating him, the said Floyd Springer, in and upon the head and body of him, the said Floyd Springer, with a club then and there held in the hand of him, the said Will Garner, from the effect of which wound he, the said Floyd Springer, then and there immediately died, against the peace and dignity of the State of Arkansas."

The evidence in this case is voluminous and mostly circumstantial. The scene of the tragedy was a field belonging to Mr. Roberts, in Logan County, hard by a much-traveled public road and near the wire gate opening from the field into the road. Floyd Springer, the deceased, Will Garner, the appellant, and O. P. Hamm were at work in the field on the day of the killing. Appellant went to the house for dinner for the deceased, and was seen returning between 12 and 1 o'clock, and rode into the field and about thirty yards from the gate, reached down and handed him a bucket containing the dinner. About 1 o'clock a witness saw the deceased and appellant near the gate, and no one else was there, and the horses appeared to be done eating. Mr. Hamm,

who went from the field to his dinner, returned about 1 o'clock, and found appellant at the gate sitting by the horses that Springer had been plowing, which were still eating, and asked where Springer was. Appellant said he was gone off with two men to look at some land and told him to watch his team. Witness told him to take this team and go on to work, that it was after 1 o'clock.

About 3 o'clock Mr. Roberts returned and drove out into the field, and when Mr. Hamm came out to the end of the row and waited till appellant drove out too, and asked him where Springer was, he said, "The last time I saw him he was standing over yonder" in a southwesterly direction from us. Mr. Roberts went down that way, and found Springer dead. His skull was crushed in on both sides, his breast considerably bruised, and some marks or little cuts on his throat and neck, all appearing to have been done with a stick or club, the little cuts with the end of it. He was lying on his back with his head on a rail, his hands across his breast, and his feet stretched out toward the west side by side. There were no signs of a struggle, and the blood ran down on the back of the head and neck—was scattered around in every direction from the body. A club or stick with fresh blood on it was found about fifty yards from the body in an old clay root. There was a bottle of morphine found on the body, but no money, and near it a paid note of Springer's to Levi Green, who saw him tear off his signature and put it in his purse a day or two before when he paid it. The body was lying in behind a briar thicket and tree top, from where they were plowing, which was the only place nearby which would hide a man from view from the public road.

Will Garner, appellant, testified: I am 13 years old; will be 14 the 6th day of May; was born in 1896, at Memphis, Tenn.; left Memphis when I was about 4 years old. I came down here from Shawnee to work in the barber shop. I first met Mr. Roberts at the courthouse. He was appointed to defend me here at the last term of court. After that I went and stayed at his house for about two months; was there when Mr. Springer began to work for him on Monday. Mr. Hamm was working with us. I brushed in oats that morning. I left before the rest of them to get Mr. Springer's dinner. I don't recollect

whether I met any one going from the field to the house or not.
I took the dinner back to the field. When I got back to the field
Mr. Springer was sitting down by the gate with two men, whom
I did not know. He ate dinner, and I shucked corn for the
horses. The men got up and looked around while he was eating
dinner, and he got up and walked off with them. He told me
to watch the horses. They went around the branch, and turned
the road. I don't know how far they went. Finally they came
back, and Mr. Springer went with them. I did not see him any
more until I don't know just how many minutes. Any way I
laid down by a tree, and the horses went around the bend, and
I saw Mr. Springer and the two men standing by them two racks
of wood as I went to get the horses. I came back, and saw Mr.
Hamm coming, and the men passed there with a bale of cotton
and another man. I did not see Mr. Hamm walking back
about this time. I did not see Mr. Springer any more until Mr.
Roberts came down there and found him dead. At that time
I was plowing. Mr. Hamm asked me where Mr. Springer was,
and I told him, and he told me to take his team and come on
and plow with it, and I did so. When Mr. Roberts came, I
told him that Mr. Springer had gone off with the two men. I
did not go to the body until Mr. Roberts called me and Mr.
Hamm. Then I went with Mr. Hamm. I did not know he was
dead until Mr. Roberts called me. Mr. Roberts told Mr. Hamm
and I to stay there until he went to town, and we did so; never
done anything but stayed there until 4 or 5 o'clock, and then I
took the team out and carried them to the house. I heard Mr.
Jones and Mr. McConnell say that that little negro was as liable
to do it as any body."

The other circumstances tending to connect appellant with
the killing were a speck of blood spattered on his cheek and a few
specks on one pants' leg and perhaps a drop on his shoe and six
half dollars that were found concealed in his shoe the next
morning. Springer was shown to have been paid five dollars
in half dollars a few days before the killing, and to have had
some silver in his purse when he put the paid note in it after
tearing off his signature. Mr. Hamm saw appellant tying his
shoe when he put him to work after 1 o'clock, and another wit-
ness saw him about 2 o'clock "sitting over on his plow or by

it working with his shoe somè way," the day of the killing. Appellant made contradictory statements about how he came by the money, and was contradicted by people from whom he claimed he got it.

The court instructed the jury orally and fully on murder in the first degree, without objections or exceptions, after giving first the following instruction:

"1. If the accused is between the ages of 12 and 14, the presumption is that he is incapable of crime, and the burden is on the State to prove that he has mental capacity enough to know right from wrong in relation to the offense charged. This may may be done by circumstantial evidence, as well as by direct evidence. If over 14 years of age, defendant is presumed to be capable of committing crime. The age and capacity of defendant to commit crime is for the jury to determine. If defendant is answerable to the law, then the law of the case is as follows:" etc.

The judge wrote in the bill of exceptions: "The defendant from appearance might be judged to be from 17 to 18 years old ar time of trial, and jury might so have found."

The bill of exceptions recites further: After the jury had been out deliberating, they came in and asked the judge if they could convict the appellant of murder in the first degree, and give him a life sentence. The court told them that they could not do this, but that they might convict of murder in the second degree, and fix the punishment in the penitentiary not to exceed twenty-one years.

"Shortly afterwards the court, while the jury was out deliberating, was at recess, and Governor Donaghey was speaking in the court room, and the jury-bailiff informed the judge that the jury desired to report. They were advised that they would be sent for as soon as the speaking was over. Before it was finished the sheriff asked the judge to be excused, that the defendant was about to make a confession, and returned shortly and informed the judge that he had made a confession. The judge directed the sheriff to ask him if he desired to make the statement to the jury, and, being informed that he did, then the judge told the sheriff to inform the jury that he would send for them soon, and not to report until sent for. When Governor

Donaghey finished speaking, the court resumed business, and the jury came, and the defendant "and defendant's counsel were called, and were present during part or all the subsequent proceedings."

Defendant was informed by the court that he understood from the sheriff that defendant wanted to make an additional statement to the jury. Defendant said he did, and was told he might do so, but to make no statement but the truth. He stated in substance: "That he was the one who did the murder; that no one helped him; that no men passed; that Springer went to sleep after eating his dinner, and defendant was taking Springer's money from Springer's pocket, and Springer waked up and accused defendant of it. Defendant denied it, and they jawed a little, and defendant struck Springer in the head with a club shown on the trial. At this time Springer was raising up a little and fell back, and defendant struck him again a time or two with the club, killing him, and that Springer's head was on the flat rail shown in evidence at the time he was asleep, and fell back on it when first struck with the club." No question was asked defendant by any one, except the judge asked about the club and the rail and the position Springer was in when asleep and when struck."

Counsel for appellant was present at this time, and made no objection and saved no exception, and Mr. Roberts, one of the counsel, stated in open court that he was glad that at last the truth of the matter had come out; that he had tried to get to the truth, but had not been able to do it.

Mr. Roberts, of counsel for the appellant, in closing the case to the jury, turned to the defendant, and, addressing him, told him he (Roberts) never expected to have anything more to do with him; that he never wanted to speak to defendant, or defendant to come in to his presence, no matter what was done in the case, and bade the defendant, in the presence of the jury, court and spectators, a tragic good-bye. This was before the case was first given to the jury.

The following statement is also made in the bill of exceptions by the judge:

"The attorneys having been assigned by the court to defend Garner, and having performed that duty ably, and bidden the

defendant good-bye, the court did not feel it necessary to inform them or State's counsel that defendant, in his own person, wished to make an additional statement to the jury.

"The statement of the defendant to the jury was, so far as the court could see and know, free and voluntary, and the result of the strain that he had undergone in the trial and the good-bye of Mr. Roberts. The jury retired, and afterward returned into court a verdict, convicting of murder in the first degree. No information that any other verdict was ever agreed on was had by the court, and no other verdict was any time brought into the court or offered to it."

After further deliberation, the jury returned into open court a verdict of guilty of murder in the first degree, and on the next day the court passed sentence upon the said defendant, and adjourned until July 30, 1910, and defendant appealed.

The appellant was convicted of a capital offense. No objection was made to the instructions given, and only two objections to the introduction of testimony, and no error was committed in overruling them. Was any error committed by the trial court prejudicial to the rights of appellant that is required to be heard or considered by this court by the act of May 31, 1909, that calls for a reversal of the case?

We think so. Our Constitution guarantees the right of every person on trial charged with a felony "to be heard by himself and his counsel," and the statute requires the court, if he be unable to employ, to assign him counsel, at his request, to conduct his defense. The record shows appellant was duly assigned counsel to defend him, but that Mr. Roberts, of counsel for the appellant, in closing the case to the jury, turned to the defendant, and in addressing him told him he (Roberts) never expected to have anything more to do with him; that he never wanted to speak to defendant, or defendant to come into his presence, no matter what was done in the case, and bade the defendant, in the presence of the jury, court and spectators a tragic good-bye.

After this good-bye and after the jury had deliberated on appellant's case a night and till noon next day, and returned into court and been instructed that they might convict of murder in the second degree and fix the punishment not to exceed twenty-

one years in the penitentiary, and retired again and notified the
court that they were ready to return a verdict, the court, having
had information of the confession by the appellant, advised them
not to report till sent for.  Appellant was then brought into court,
and allowed to make the confession after being asked by the
court if he wished to make a statement and being told to make
no statement but the truth. -

"The attorneys having been assigned by the court to defend
Garner, and having performed that duty ably, and bidden the
defendant good-bye, the court did not feel it necessary to inform
them or State's counsel that defendant, in his own person wished
to make an additional statement to the jury."

Surely this was appellant's time of greatest need for coun-
sel "to conduct his defense;" but so effectually had they bidden
him good-bye that the court concluded their duty discharged,
and did not regard it necessary to advise them that he was going
to make a confession.  He had them called, however, and the
record says they were "present a part or all the time" there-
after.  After the confession was made, "no question was asked
defendant by any one except the judge about the club and the
rail and the position Springer was in when asleep and when
struck."  The record recites again: "Counsel for appellant was
present at the time, and made no objection, and saved no excep-
tion, and Mr. Roberts, one of the counsel, stated in open court
that he was glad that at last the truth of the matter had come
out; that he had tried to get the truth, but had not been able to
do it."  This is the same Roberts, who abandoned the defense in
so tragic a manner, now lending his emphatic indorsement to the
truth of the confession without in any way trying to discover
what means had been used to secure it and whether it was volun-
tarily made.  The most that the record discloses is that appellant's
counsel appeared after the confession was made and before the
judge finished questioning him about the manner of the killing.

It is true the record recites that "the statement of the de-
fendant to the jury was, so far as the court could see and know,
free and voluntary, and the result of the strain that he had under-
gone in the trial and the good-bye of Mr. Roberts."  But it also
shows no counsel was there to advise him as to whether im-
proper means and inducements had been used to obtain it, and

whether it was voluntarily made, and that the court asked but one question, whether he wished to make a statement, which could not have disclosed the fact. If appellant's statement that he would not be 14 years of age till May is true (and it is only contradicted by the judge's opinion that he appeared to be 17 or 18 years old at the time of the trial), the law presumes him not criminally responsible, and that presumption prevails until the evidence clearly establishes that he understood the nature of the offense charged and its consequences. Under our law a minor can not choose his guardian, even with the consent of the court, till he is over 14 years of age, and the courts are required to guard with jealous care and protect an infant when his property is involved, and will it permit them to be less careful when his life is at stake? We think not.

It was within the discretion of the learned trial judge to permit the introduction of further testimony after the case was closed and given to the jury and before they had delivered their verdict to the court, and we find no abuse of this discretion.

The infant defendant was entitled to have his counsel present "to conduct his defense" and ascertain before its admission whether the confession was voluntarily made, without which it is not probable the jury would have rendered the verdict they did. He did not waive this right when the court asked him if he wished to make a statement to the jury by answering that he did. The court made no effort, other than this question, to ascertain whether the confession was voluntary, and its admission under the circumstances in the absence of appellant's counsel was error and highly prejudicial. The case is reversed and remanded for a new trial.