Deborah Lynne LITTLE *v.* STATE of Arkansas

CR 76-109                                          554 S.W. 2d 312

Opinion delivered June 27, 1977
(Division I)
[Rehearing denied September 19, 1977.]

860

862

*Spencer & Spencer,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *Terry R. Kirkpatrick,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Carey Dean Little literally had his brains blown out by a shotgun blast as he lay sleeping in his bed at his home in Huttig, Arkansas, very early on the morning of January 16, 1975, his thirty-second birthday. His daughter Deborah Lynne (born August 5, 1960, according to her mother) was charged with his murder, found guilty, and sentenced to life imprisonment for murder in the first degree. She seeks reversal of this conviction on ten grounds. They are:

I

APPELLANT'S STATEMENT, MADE AT HER ARREST, AND ADMITTED OVER OBJECTION, WAS INVOLUNTARY AND INADMISSIBLE.

II

APPELLANT'S TAPE RECORDED STATE-MENT, ADMITTED OVER HER OBJECTION, WAS INVOLUNTARY AND INADMISSIBLE.

III

APPELLANT'S STATEMENTS, MADE AF-TER SHE HAD RETAINED COUNSEL AND WITHOUT PRIOR NOTICE TO COUNSEL, WERE INADMISSIBLE.

## IV

INSTRUCTIONS ON BURDEN OF PROOF TO REBUT THE PRESUMPTION OF CHILD'S CRIMINAL INCAPACITY WERE ERRONEOUS.

## V

INSTRUCTIONS DENIED APPELLANT BENEFIT OF THE PRESUMPTION OF CHILD'S INCAPACITY TO COMMIT CRIME.

## VI

INSTRUCTIONS WERE INCONSISTENT AND INHARMONIOUS.

## VII

TESTIMONY OF NON-EXPERTS AS TO APPELLANT'S ABILITY TO DISTINGUISH RIGHT FROM WRONG WAS INADMISSIBLE.

## VIII

DENIAL OF APPELLANT'S MOTION FOR A DIRECTED VERDICT OF ACQUITTAL WAS ERRONEOUS.

## IX

FAILURE TO TRANSFER THE CASE TO JUVENILE COURT WAS ABUSE OF DISCRETION.

## X

INSTRUCTION TO THE JURY ON CIRCUMSTANTIAL EVIDENCE WAS ERRONEOUS.

We find no reversible error and affirm.

Perhaps the most critical question in the case arises from incriminating statements made by appellant and admitted into evidence over her objection. This is critical solely because of appellant's age. Proper consideration of the admission of this evidence requires that the sequence of events leading up to the making of these statements be reviewed.

Brenda Sue Little, wife of Carey and mother of Deborah Lynne (who was called Debbie), was in bed with her husband when she was awakened by an explosion. She discovered that he was severely wounded and jumped out of bed. About that time, Debbie ran into her parents' bedroom screaming and hollering, and then ran out. Mrs. Little followed, grabbed Debbie and her two brothers, and took them all into the living room, but Debbie ran back into the bedroom, screaming and hollering. Mrs. Little called her father-in-law and Ronnie Tucker, the marshal. She went into the bathroom to get something with which to wipe her husband's face and Debbie was there, crying but not hysterical. One of the sons found a shotgun shell case in the hallway outside the bedroom door. It was pointed out to Marshal Tucker when he arrived at the Little house and he delivered it to Deputy Sheriff Vines, who came to the house pursuant to a call he received at 4:39 a.m. These two officers started looking for a shotgun and found one in Debbie's bedroom closet behind some clothing. The bathroom window was open and the screen pushed out. It appeared to Marshal Tucker that it had been pushed out from the inside and another officer said the screen was stretched toward the outside. Tucker found no marks on the muddy outside wall. There were no footprints near the window. The ground was wet and soft. Neither mud nor tracks were found in the bathroom. The back door of the house was locked.

Later, Vines went with Chief Deputy Sheriff Saunders and Deputy Sheriff Vinson to the residence of Mrs. Paul Murray, Deborah's aunt, where they found Deborah and some of her relatives shooting pool. Saunders and Vinson interviewed Deborah and her brother, in the presence of Vines and of Tucker, who was there when the other officers arrived. Debbie told the officers that she had heard the shot, gotten out of bed, gone to the door, turned on a light, saw her

mother coming out of her parents' bedroom crying, looked in, saw him and almost "went out." The officers then talked to the victim's father. They later took a statement from Darlene and Geraldine Dollar and arrested Debbie on the basis of their statements. The arrest was made near noon, without a warrant. The officers had first gone to her grandfather's home and told him and Mrs. Little they were going to arrest Debbie. When Saunders told Deborah that she would have to come with the officers and would be charged with the death of her father, she seemed upset and said she didn't want to go. Saunders said that Mrs. Little was upset, too, and that Mrs. Spells comforted Deborah. Deborah was taken in an automobile to the county juvenile home. Mrs. Little did not accompany them, but Mrs. Spells did. Mrs. Little testified that she was not permitted to go, but Saunders testified that she did not ask to be allowed to do so. Mrs. Little said that she realized that she herself was a suspect when the officers questioned her at the hospital to which her husband was taken. When they got into the car, Vinson warned Deborah of her constitutional right to counsel and her privilege against self-incrimination by reading from a card he carried. The officers asked Deborah no specific questions about the crime. When Vinson started to ask Deborah some questions after he had given the warnings, Saunders would not allow him to do so. The officers overheard Deborah say something to Mrs. Spells, with whom she was riding in the back seat, about hating her father and having "done it." Vinson said that she acted calm and collected. Saunders then advised Deborah not to say anything at all and that she shouldn't even be talking about the matter.

When they arrived at the juvenile home the officers turned Deborah over to Barbara Bird, a juvenile probation officer, and went to the sheriff's office and called Deputy Prosecuting Attorney Joe Calloway. Later they met him at the juvenile home. They had purposely delayed going there to make certain that Deborah's mother could be present before the officers talked to her, and went only when they had been advised that Mrs. Little was there.

Saunders said that Calloway explained Deborah's rights to Mrs. Little and told her that, in his opinion, they would

have to have Mrs. Little's permission before Deborah's statement could be taken. He said that Calloway gave the standard warnings that Deborah did not have to make any statement, that she was entitled to an attorney and that if they did not have the money to hire an attorney that one would be appointed free of charge.

Calloway asked Mrs. Little if she wanted to talk to her daughter before he and the officers talked with her. The mother and daughter went into a room where they were alone and they remained there for 10 or 15 minutes. When they returned, Mrs. Little said that Deborah wanted to tell what had happened. Mrs. Little looked as if she had been crying.

Vinson took charge of an interview of Deborah in an office in the juvenile home in the presence of Mrs. Little, Mrs. Bird, Deputy Sheriff Saunders and Deputy Prosecuting Attorney Calloway. Vinson first turned on a tape recorder and repeated the "Miranda warnings," saying that these were given for both Deborah and her mother. He said that Deborah was calm and collected and paying attention. Neither Deborah nor her mother indicated in any way that either desired the assistance of counsel. Vinson said Deborah gave no indication that she did not desire to make a statement. No one other than Vinson asked any questions.

The tape recording reflects that Vinson first identified everyone present and proceeded to recite warnings about Deborah's right to assistance of counsel, her right to remain silent, and that anything she said could and would be used against her. Vinson received an affirmative answer when he asked Deborah if she understood. No audible answer of Mrs. Little was recorded. Vinson said that she did respond in the affirmative, but that the recorder had not picked up her low-voiced answer. Vinson then asked Deborah if she wanted to talk to the officers, and when he received an affirmative reply, he confirmed by Deborah that she had previously been warned of her rights. He also confirmed the fact that Mrs. Little had conferred with Deborah before the interview.

Vinson then asked Deborah to explain everything that happened after 4:00 a.m. She then narrated what had hap-

pened from the time she had awakened early in the morning until she was brought to the juvenile home. She said that when she had awakened she got the gun out of her closet where she had hidden it, loaded it, went into the hall, closed her brothers' bedroom door, went and opened a window screen to make it appear that someone else was the perpetrator of the crime, went back into the hall, pulled the trigger, shot her father, ran with the gun, forgetting to pick up the shell, hid the gun in her closet and got back in her bed. She then got up, met her mother coming out of the bedroom and started "screaming and squalling." After Deborah completed her narration, Vinson asked her if she had planned this and if she had told anyone what she was going to do. She said that she had told her friends Darlene and Geraldine Dollar and that the three had planned to leave home, but she was planning to kill her father before they left. The interview was concluded at 4:27 p.m. It had lasted seven minutes.

Barbara Bird testified that when the officers brought Deborah to the youth home, they explained that, because of her age, they did not think it a good idea to take her to jail and asked her to talk to the girl in order to ascertain her attitude and the risk of her running away. Mrs. Bird understood that she was not to interrogate Deborah. Mrs. Bird took the girl on a tour of the facilities, but asked her no specific questions pertaining to her being charged with the crime or the occurrence in Huttig. Mrs. Bird said that Deborah was calm, able to carry on a normal conversation and did not appear nervous or distraught; that Deborah had been permitted to remain, without restraint, in the reception room, where only a female receptionist was present, until Mrs. Little came; and that after Mrs. Little had talked with her daughter privately, she told Deborah to tell the truth. She said that after Deborah's statement was made, Mrs. Little asked Calloway what she should do and he responded, "Definitely, get an attorney."

Calloway testified that Mrs. Little did not indicate at any time or in any way that Deborah should not talk to the police or that she desired an opportunity to obtain an attorney before the police talked to Deborah, even though he advised her that she had this right. No one had asked

Deborah if she wanted an attorney.

Mrs. Little testified that in spite of the fact that the possibility of the appointment of an attorney was mentioned, she did not know what to do, being in shock and under sedation. She said that Deborah was sedated by five milligrams of Valium, some of which was given her by Linda Bussey and the remainder left for her at the home by Mrs. Little's brother-in-law Paul Murray. Mrs. Little said she knew that Deborah had taken the medication because she became calm. She also said that she had left the medicine with the house mother at the juvenile home. She testified that she was advised by Calloway that if she did not have the means to hire a lawyer, he could get the "State" to appoint one, and that she had told Calloway that she'd get her own lawyer. She admitted that she had encouraged Debbie to tell the truth and that she understood "our" rights and knew that she could get her own attorney before the statement was made.

Mrs. Tommy Dumas, Deborah's maternal grandmother, testified that between 10:00 and 11:00 a.m. on January 16 at the Murray residence, she had given Deborah two tiny white tablets that Mrs. Bussey had given her, but did not know what they were. She said that Debbie was nervous and distraught when she was given the pills, but thereafter she appeared to regain her composure and took a short nap for 20 or 25 minutes until Mrs. Dollar came over, awakened Deborah and took her to the Dollar residence. She said that Deborah complained of being dizzy when she awakened, and that even though her words wouldn't come out distinctly, Mrs. Dumas had no difficulty in understanding her. According to Mrs. Dumas, when Deborah returned from the Dollar home, she was moody. Mrs. Dumas said that she asked to be permitted to go along when Deborah was arrested, but was refused permission.

The officers denied any knowledge of Deborah's having taken any medication. They said that no inquiry was made to determine whether Deborah had taken any medication. No one says that they had been informed of this fact, or that there was any real indication of medication when the statement was taken that would have prompted any inquiry along

this line. The "house nurse" at Huttig had told Saunders at the Little residence that morning that she had given Mrs. Little something to calm her nerves, but did not say that she had given Deborah anything. No one suggests that there were any threats, promises, offers or suggestions of leniency, plea bargains, or other inducements to Deborah's making a statement. Those present positively deny that there were.

A psychiatrist who had observed and examined Deborah at the Arkansas State Hospital testified. He had conducted psychiatric interviews and psychological examinations. He had no difficulty communicating with Deborah and said that she seemed anxious to tell her story. He said that after 30 minutes' interview, Deborah asked him if he did not want to know why she was there. He found no sign of physical or mental defect, organic brain disease or brain trouble. Although he found her intelligence quotient to be in the low dull normal range, he said that such a person can get along fairly well in everyday living situations and that she would have the ability to understand statements made to her concerning her rights and, in his opinion, she could understand rights as contained in the "Miranda warnings," but admitted that there was no way for him to know that she did understand. He felt that it was unlikely that her will could be overborne. Her obesity indicated basic insecurity and inadequacy to this psychiatrist. He said that this would make her fearful of doing the wrong things. He said that Deborah told him that she had wanted to do what she had done for a long time, that she had planned it and had taken the gun and shell from her father's room some three or four days prior to the killing.

A psychiatrist at the South Arkansas Regional Health Center testified that he had done research into the effects of the drug called Valium, which he described as a prescription drug known as an anxiety reducing drug. He said that it came in four different forms, each colored differently. The white tablet is two milligrams. He doubted that two of them taken simultaneously would have any effect at all. He said that he seldom used these tablets because they were so weak, but that they might reduce a very minor amount of anxiety. According to him, this drug relieves anxiety, probably by relaxing muscles, but without causing sleepiness, or "messing

up" the clearness of the thinking processes. He said that the action or the oral medication lasts a little longer than two to three hours, that one-half of it is eliminated from the body within four or five hours; and, after five or six hours, approximately one-half of its effect has worn off, though it could possibly have some effect for ten or twelve hours. He testified that unless Valium was given in dosages of more than 50 milligrams, one would be unable to overcome the will of the person to whom it was given. In his opinion, one would not be more subject to enticement or to being misled as a result of taking Valium. In response to a hypothetical question, he expressed the opinion that two of the tablets taken at the time they were said to have been given Deborah would have had no effect on anyone's thought processes at the time Deborah gave her statement and the person so administered the medication would have no difficulty in understanding someone advising him of his legal rights. He acknowledged that different persons reacted differently to different drugs.

Linda Bussey, a licensed practical nurse, who was industrial nurse for Olin Kraft in Huttig was called to administer first aid to Carey Dean Little. She knew Deborah Little, Mrs. Dumas and the Murrays. About noon on the day of the crime she gave medication to the victim's mother. The next morning she gave Brenda Little medication to calm her down by intramuscular injection. The medication was prescribed by physicians. She said that she did not leave any Valium or white tablets of any kind on either occasion. She further stated that she was not asked for administration of any kind of medication by any other member of the family and denied that Paul Murray requested any type of medication for appellant. She positively denied administering any medication, orally or intravenously, to Deborah. She said that she did not keep Valium, or any type of tranquilizer at her office. She related that Mrs. Murray had called before she came to testify and tried to make her remember giving some white tablets to Murray to give Debbie but said that she told Mrs. Murray that she did not do so and would have to say that she did not. She admitted that she had a prescription for Valium for her own use and probably had some yellow, five milligram tablets at her home on the days she went to give medication to the ladies.

Paul Murray testified that when he came home from the hospital and said that Little had died, Debbie became very upset, and that he called Mrs. Bussey, who said that she might be able to give him something for her. He said he went to her house around 7:00 a.m. and she came to the door and gave him four white pills, saying that he should give Debbie two then and two later. He said that Mrs. Bussey told him the pills were not very strong, no stronger than aspirin, and something like Tylenol. According to him, they probably were Tylenol. He had no difficulty communicating with Deborah.

Mrs. Paul Murray testified that she saw her mother give Deborah two pills. She said that Deborah seemed relaxed, but told her that she was dizzy. She testified that she had talked with Deborah after the latter had talked to the police. She said that Deborah just broke down and told her "she had done it" but that she didn't know why, and that she also made the remark that she had pushed the screen out of the bathroom window. Mrs. Murray said that "She hates that she has done it to a certain extent."

Deborah did not testify at the hearing on the motion to suppress the confessions. Mrs. Spells testified at the trial but not at the suppression hearing. She said that Deborah's statements in the automobile followed the officer's asking Deborah if she wanted to say anything concerning what had happened. She said that Deborah first said no, then said yes. She said that Deborah was calm on the way to El Dorado. She also stated that the officers would not permit Mrs. Little or any other member of the family to accompany Deborah to El Dorado when she was arrested.

Martha June Holdredge testified at the trial. She was a house mother at the juvenile house, where Deborah stayed about four months. She sat with Deborah 24 hours a day. She said Deborah would sit and hold her hand all day and was frightened at night. Mrs. Holdredge would hold Deborah's hand at night. Sometimes Deborah would sleep on a pallet in the house mother's room. After the two got acquainted, Deborah told Mrs. Holdredge that she had killed her father and that she had hated him because of his drinking and

because he had made sexual advances toward her and she feared a sexual attack by him. According to this witness, Deborah told of hiding the gun in her closet, of getting up, shooting him, going back to bed, getting up again, looking at him and becoming hysterical. She said that she developed a close relationship with Deborah and that Deborah was very cooperative.

Appellant not only relies upon her immaturity, but seems to view the evidence in the light most favorable to her. We find no basis for rejecting the officer's testimony that they did not interrogate Deborah while she was in the automobile or the testimony of the psychiatrist that Deborah was capable of understanding an explanation of her rights. Mrs. Spells did not testify at the suppression hearing. The extreme care taken by the officers to avoid putting Deborah in the jail and to await her mother's arrival before she was questioned certainly indicates that they would not be less cautious while riding in the automobile with a family friend present. Although the youth of the maker is an important consideration, we have never held that it is a sufficient basis for exclusion of an incriminating statement, even when given without the advice of a parent or counsel. *Jackson* v. *State,* 249 Ark. 653, 460 S.W. 2d 319; *Tucker* v. *State,* 261 Ark. 505, 549 S.W. 2d 285; *Mosley* v. *State,* 246 Ark. 358, 438 S.W. 2d 311. In these cases, as in others, we look to the totality of the circumstances. *Tucker* v. *State,* supra; *Watson* v. *State,* 255 Ark. 631, 501 S.W. 2d 609.

Viewing the totality of the circumstances, it appears that Deborah had a compulsion to tell anyone who would listen what she had done. It would be difficult to say whether she was motivated by the rancor of hatred, pride in her accomplishment or a sense of guilt that compelled her to confess. Whatever motivated her, she seemed ready, willing and anxious to tell of her crime. She confessed at least four time to adults and had told her two friends and schoolmates, the Dollar girls, of her intention and showed them the gun she intended using. Once she realized that her concocted version of the episode was discredited, it probably would have been difficult to have kept her from telling those in authority and impossible to keep her from telling others. Even though appellant was classified as of "dull normal" intelligence she

was not even mildly mentally retarded. The very deliberate planning and careful execution of the crime, and of her first version of it were indicative of a mental capacity beyond infancy and imbecility. The statement in the automobile appears to have been spontaneous and voluntary.

Spontaneous statements are not to be excluded. See *Chenault v. State,* 253 Ark. 144, 484 S.W. 2d 887. The real question, especially when warnings mandated by *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 ALR 3d 974 (1966), are effectively communicated, is "Is the confession the product of an essentially free and unconstrained choice by its maker?" "If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of the confession offends due process." *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

The taped confession was a record of the entire interview. The argument that it was inadmissible is based upon her immature age, the alleged taint of the prior statement made in the automobile, the brevity of the conversation with her mother, and the fact that Deborah was held in an atmosphere that had the appearance of a regular home and was taken by the probation officer on a tour of it during which the officer talked to her about "boys and boy friends" and "girl things." Appellant advances the novel argument that the net effect of this treatment was to lull her into a sense of security and well being that she would not have felt had she been incarcerated in the Union County jail, so that when she was confronted with two deputy sheriffs, a deputy prosecuting attorney and the probation officers, none of whom were in uniform, her will was overborne and her confession was not the product of her free will.

Perhaps appellant's argument would be entitled to greater weight had the interrogation been in the ordinary jail atmosphere by uniformed officers, before her mother arrived, after having been held in jail alone for some hours. We find nothing coercive in the atmosphere in which the statements were taken or in the procedures followed after Deborah was

taken to the juvenile home.

It is also urged that the confession to the house mother was involuntary because the state failed to show the circumstances surrounding it. We think the uncontradicted testimony of the witness herself constitued an adequate statement of circumstances to permit admission of the testimony, unless it be inadmissible for other reasons. In advancing this argument appellant compares the juvenile home to a jail, rather than a place with a "homey" atmosphere, and the house mother to a jailer. Reliance, however, is placed upon *Vault v. State,* 256 Ark. 343, 507 S.W. 2d 111 where the statement of a 16-year-old youth was given to officers shortly after his lawyer had left the jail where he was incarcerated, after having been present during two lineups. In this case, the only showing that an attorney had been retained was the appearance of appellant's counsel at a preliminary hearing. But *Vault* and other cases are based upon an inhibition against interviews of persons charged and held in custody, without giving retained counsel an opportunity to be present. In *Vault* we said that we would not go so far as to hold that a confession by a prisoner in jail can never be voluntary and admissible. The only objection offered in the trial court to this testimony was the absence of counsel. To hold that this statement was inadmissible would mean that any spontaneous statement made in custody in the absence of counsel was inadmissible.

In spite of the age of appellant, we are unable to say, when we consider the totality of the circumstances that any of the incriminating statements made by appellant were the product of an overborne will. Insofar as the effects of medication are concerned the evidence that any had been administered is far from convincing. We cannot find sufficient evidence that there was an indication of this condition which would have required further inquiry or greater caution by the officers. See *Cox v. State,* 240 Ark. 911, 405 S.W. 2d 937. It must be kept in mind that interviews of suspects, even minors, are normal and proper in police investigations of crime and the only purpose of the exclusionary rule is to restrain improper police action. We certainly are unable to say that the trial judge's findings of voluntariness were clearly

against the preponderance of the evidence.

Appellant also contends that the instructions given relating to the burden of proof to rebut the presumption of her criminal incapacity were erroneous. This argument is first premised upon the assumption that Deborah was less than 14 years of age. Her counsel refers to her as a 13-year-old girl throughout appellant's brief. In spite of her mother's testimony about her birth date, it is obvious that there was a basis for submitting instructions on the question. In order to put this question in proper perspective, it is necessary that we set out the instructions given, the objections made and the instructions requested by appellant and refused. The following were given, over objections stated:

## COURT INSTRUCTION NO. 13

You are instructed that our law presumes that a person between the ages of twelve and fourteen years is incapable of committing a crime or of discerning the difference between good and evil, or right from wrong, if you prefer, until the contrary be affirmatively shown by clear and convincing evidence.

\*\*\* Counsel for the defendant objects to the court's giving of the Court's Instruction No. 13 placing the burden of proof of insanity on the defendant and requiring that the defendant prove insanity by a preponderance of the evidence on the grounds that this instruction does not give effect to the Arkansas Statute which specifically states that a person is not considered sane until the age of fourteen, and that there is no presumption of sanity prior to that age. The evidence shows that the defendant was 13 at the time of the act; therefore, there is no presumption of sanity, no burden on the defendant to prove insanity by a preponderance of the evidence.

## COURT INSTRUCTION NO. 13-A

If you are not so convinced by clear and affirmative evidence, it is your duty to acquit the defendant. However, should the State meet its burden in this

regard, it would then become your duty to consider the defense offered by the defendant of insanity at the time of the commission of the crime. In that event, you are instructed that the law would then presume that she was sane and that she intended the ordinary and natural consequences of her act and the burden would then be upon her to prove by a preponderance of the evidence at the time of the commission of the killing that she was insane. If she proves to you that she was insane at the time the offense was committed, it would be your duty to find her not guilty by reason of insanity.

Counsel for the defendant objects to the giving of Court Instruction No. 13-A on the grounds that it eliminates one of the defenses in this case which is that a person between the ages of 12 and 14 is incapable of committing a crime and on the grounds that it places the burden of this defense on the defendant rather than on the State and also on the grounds that the instruction is contrary to the Court Instruction No. 13 and it is confusing to the jury. Defendant's Requested Instruction No. 1 is not given.

The following was requested and refused:

## DEFENDANT'S REQUESTED INSTRUCTION NO. 2

You are instructed that in this state the law presumes that a child under fourteen (14) years of age is incapable of committing a crime, and that such a child cannot distinguish right from wrong. The defendant in this case is entitled to the benefit of this presumption and this presumption is sufficient to justify an acquittal in this case unless and until overcome by evidence which convinces you beyond a reasonable doubt that the defendant, Deborah Lynne Little, had the mental capacity and maturity to distinguish between right and wrong and to form the criminal intent necessary to commit the crime with which she is charged.

Counsel for the defendant objects to the failure of

the court to give defendant's requested instruction No. 2 on the grounds that the court has used less than the requirement that the State must prove that the defendant knows the difference between right and wrong and good and evil beyond a reasonable doubt and has required the State to prove something less than this issue, beyond a reasonable doubt.

We have some difficulty in relating some of appellant's arguments here to the objections made in the trial court. She relies upon our holding that, under the common law, one 13 years of age is presumed to be incapable of committing a crime and that this presumption prevails until the state shows that he had the mental capacity and intelligence to know right from wrong in reference to the offense with which he was charged. *Harrison v. State,* 72 Ark. 117, 78 S.W. 763. Appellant also points out that we have held that: the presumption against the capability of discerning between good and evil prevails until the contrary is shown affirmatively by the evidence, *Dove v. State,* 37 Ark. 261 (see also, *Allen v. U.S.,* 150 U.S. 551, 14 S. Ct. 496, 37 L. Ed. 1179); and that this evidence must clearly establish that one aged 13 understood the nature and consequences of the offense charged, *Garner v. State,* 97 Ark. 63, 132 S.W. 1010, Ann. Cas. 1912C 1059. This is substantially what the jury was told by instruction No. 13.

It takes a strained reading of this instruction to find the ambiguity suggested by appellant, i.e., that the jury could believe that appellant was incapable of discerning right from wrong but capable of committing a crime. The objection made does not seem to reach this alleged flaw because of the use of the word "or." A specific objection along the lines now argued would have been calculated to produce a minor correction to remove it.

Instructions are to be read and construed reasonably. *Arnott v. State,* 109 Ark. 378, 159 S.W. 1105. It is at least as reasonable to say that instruction No. 13 as given required that the state show two independent factors, i.e., (1) that Deborah was capable of committing a crime and (2) was capable of distinguishing right from wrong or good from evil,

because the presumption stated is that one of that age was presumed to be incapable of either committing a crime or distinguishing right from wrong. This interpretation would be more favorable to appellant than the law requires. See *Harrison v. State,* supra. But in any event, we do not think the instruction was misleading in that respect.

As appellant points out, the common law presumption that one under 14 but over 13 years of age does not have the capacity to commit a crime is rebuttable, and the burden is on the prosecution to clearly establish his capability of appreciating the nature of his acts, but the strength of the presumption varies with the actual age of the child and decreases as the upper limit is reached. To require this presumption to be rebutted beyond a reasonable doubt in a case where the minor's age is near 14 is hardly consistent with the common law rules. The court's instruction No. 13 requires the quantum of evidence required by the Arkansas cases. *Garner v. State,* supra.

Appellant also contends that she was deprived of the benefits of Ark. Stat. Ann. § 41-111 (Repl. 1964) by the court's instructions 13 and 13-A. We do not agree. The section related to the presumption of sanity. It reads:

"A person shall be considered of sound mind who is neither an idiot nor a lunatic, or affected with insanity and hath arrived at the age of fourteen (14) years, or before that age, if such person know the distinction between good and evil."

The single simple requirement of that section is that one under the age of 14 years is to be presumed sane if that person knows the distinction between good and evil. Thus, when and if it was shown by the state that Deborah did have the ability to distinguish between good and evil, the presumption of sanity comes into play, just as if she had been 15, 18, or 21 years of age or older, and this was recognized by instructions 13 and 13-A.

We do not agree that the essence of appellant's requested instruction No. 2 was not covered by the court's in-

structions 13 and 13-A. It, however, would have required the state to prove appellant's capacity to commit a crime *and* to distinguish between right and wrong *and* to form the criminal intent necessary to commit the crime. But the state was only required to show that Deborah had the mental capacity to know right from wrong in reference to the offense with which she was charged or the nature of the charge and its consequences, and, for the presumption of sanity to come into play, to know the distinction between good and evil. This statute does not govern the ultimate determination of the mental capacity to commit a crime. It only affects the burden of proof by establishing a rebuttable presumption, and it is not necessary that a fact which creates a presumption be proved beyond a reasonable doubt. It is only the essential elements of the crime that go to guilt or innocence that must be proved beyond a reasonable doubt. *Dillard* v. *State*, 260 Ark. 743, 543 S.W. 2d 925. The different facts and items of evidence that go to establish guilt do not have to be shown beyond a reasonable doubt, if the evidence on the whole case convinces the jury beyond a reasonable doubt of accused's guilt. *Butt* v. *State*, 81 Ark. 173, 98 S.W. 723, 118 Am. St. Rep. 42; *Starnes* v. *State*, 128 Ark. 302, 194 S.W. 506; *Martin* v. *State*, 163 Ark. 103, 259 S.W. 6, 33 ALR 133.

It should be noted that the trial court gave the usual instructions on presumption of innocence, the necessity for the state to prove her guilt beyond a reasonable doubt, the requirement of a specific intent to take life and insanity as a defense. Because of its close relationship to the matter of presumption of sanity, we quote the last named instruction, viz:

## COURT INSTRUCTION NO. 14

You are instructed that before insanity can be a defense, it is necessary for you to believe, by a preponderance of the evidence, first, that at the time of the alleged crime the defendant was under such a defect of reason from disease of the mind as not to know the nature and quality of the act she was doing, or, second, if she did know it, that she did not know that she was doing what was wrong, or, third, if she knew the nature

and quality of the act and knew that it was wrong, that she was under such duress of mental disease as to be incapable of choosing between right and wrong as to the act done and unable, because of the disease, to resist the doing of the wrong act which was the result solely of her mental disease.

Appellant is in no position to complain of the failure of the trial court to give her requested instruction No. 2, particularly in view of the instructions given, because it was not a correct declaration of the law, as we have pointed out. *Steele* v. *State,* 194 Ark. 497, 108 S.W. 2d 474.

Appellant argues that the court erred in permitting witnesses for the state to testify about her ability to distinguish right from wrong. Specifically, she points out the testimony of City Marshal Ronnie Tucker and of Mrs. Adrian Spells, Darlene Dollar and Martha June Holdredge.

Tucker stated that he had known Deborah all her life, that he had occasion to personally observe, watch, and see and talk to Deborah, that he watched her as a kid in a small town in different situations, that he had occasion to be in the Little home in more than one instance in the line of duty, and that he arrived at the opinion that she knew right from wrong from seeing her playing around the street.

Mrs. Adrian Spells had been a next-door neighbor of the Littles for three years and was a "real good" friend of the family, her children were playmates and friends of Deborah and she saw Deborah every day and talked with her sometimes. She had moved away about a year prior to the death of Little, but Deborah would come to her house and the children would play. She had the opportunity to observe Deborah's general nature, habits and disposition and said that the girl "acted normal" and that she thought Debbie knew right from wrong.

Darlene Dollar went to school with Deborah and they were close friends. She noticed Deborah's behavior in classes and formed an opinion as to whether Deborah knew right from wrong or good from evil. She expressed that opinion by

saying, "It looks like she would have known right from wrong. She didn't get into too much trouble in school."

The close association and relationship of Martha June Holdredge over a total of four months has already been related. She thought Deborah could discern good from evil.

We cannot say that the court erred in holding that each of these witnesses had sufficient opportunity to associate with and observe Deborah to form an opinion as to her ability in this regard. These opinions did not relate to Deborah's overall sanity or to her capacity to resist a propensity or temptation to commit the crime, but simply to her ability to distinguish between right and wrong or good and evil. Still, the rules governing admissibility of testimony of these analogous issues should be similar. *Carr* v. *State,* 24 Tex. App. 562, 7 S.W. 328 (1888). But appellant made her sanity an issue. Non-expert testimony is admissible on the ability of an accused to distinguish between right and wrong, if the proper foundation is laid. *Hill* v. *State,* 249 Ark. 42, 458 S.W. 2d 45.

The admissibility of testimony of non-expert witnesses on such subjects lies within the sound judicial discretion of the trial court, and its decision will not be reversed unless it is clearly wrong. *Raprich* v. *State,* 192 Ark. 1130, 97 S.W. 2d 429; *Davis* v. *State,* 182 Ark. 123, 30 S.W. 2d 830. In *Raprich* we said:

> While the testimony is not entirely satisfactory, we are unable to say that the trial court abused the discretion he was required to exercise in passing upon the preliminary question of the competency of the testimony.
>
> *****
>
> *** Such witness must show that he possesses such qualifications as to be of some assistance, and when that showing is made the decision of the trial court will not be reversed unless it clearly appears to be wrong.
> *****

In Smoot on Insanity (section 597), in discussing

the question of the competency of nonexperts, it is said: "Just what amount of knowledge and acquaintance is necessary to qualify such a witness is largely governed by the facts of each case, and within the sound discretion of the trial judge, who may declare the witness incompetent where the preliminary examination shows the facts are insufficient to qualify the witness to express an opinion. But where such witness shows any reasonable opportunity to acquire knowledge of the subject's sanity through observation and association, and is able to state any facts upon which to predicate an opinion, the meagerness of such facts goes rather to the weight to be given the opinion than to its admissibility; and the opinion formed at the time, with the facts upon which it is based, should go to the jury for what it is worth. The weight to be given to such testimony is exclusively within the province of the jury, if the facts upon which the opinion is founded themselves tend to show sanity or insanity." See, also, Vol. II Wharton's Criminal Evidence (11th Ed.) p. 1746.

We cannot say that there was an abuse of the trial court's discretion here. We do not think that *Shaeffer v. State,* 61 Ark. 241, 32 S.W. 679, relied upon by appellant is applicable here. In *Shaeffer,* the witnesses were asked whether, from their observation and the acts they detailed, the defendant would have sufficient mental power to keep from committing the crime, assuming that he could distinguish between right and wrong as to the crime charged. The evidence was held inadmissible because none of the witnesses showed any opportunity to know the defendant's capacity to resist the propensity or temptation to commit the crime. The witnesses had stated their opinions as to the capacity of the accused to distinguish between right and wrong and this testimony was not held inadmissible.

Appellant asserts that the court erred in denying her motion for a directed verdict because there was no substantial evidence that she was able to distinguish right from wrong with respect to the offense with which she was charged. It is conceded that a psychiatrist stated the opinion of the state hospital that this young lady did know right from wrong and

was able to conduct herself to adhere to the right. But appellant points out that the burden was on the state to prove that Deborah knew right from wrong in reference to the offense with which she was charged. The requisite capacity, however, can be determined from the facts and circumstances of the killing and the conduct of the defendant with reference thereto. *Kear v. State*, 84 Ark. 146, 104 S.W. 1097. The circumstances here and the conduct of appellant afforded substantial evidence on this score.

Appellant also contends that the trial court abused its discretion by failing to transfer this case to juvenile court. The basis of the argument is her age and evidence of emotional and mental immaturity. Because of this and the liberal construction to be accorded to the act of which Ark. Stat. Ann. §§ 45-420 (Supp. 1975) [Acts 1975, no. 451, § 20, eff. July 1, 1975] and 45-241 (Repl. 1964) are a part, she says that the trial court abused its discretion. There is a great emotional appeal in this sort of argument and decisions that trial judges must make are difficult ones. In order to say that there was an abuse of discretion we would have to say that the trial judge acted arbitrarily and capriciously. This we cannot do. At the time the motion to transfer was denied, the trial judge had conducted an extensive Denno hearing, which gave him a basis for the exercise of sound judicial discretion.

Appellant suggests that somehow an abuse of the court's discretion is indicated by the fact that only a few weeks after her trial, a statute was enacted which would have placed exclusive jurisdiction of the offense, committed by a minor under the age of 15 years, in the juvenile court. Ark. Stat. Ann. § 41-617 (Crim. Code 1976). It is admitted the act did not apply. It is not indicative to us of an abuse of discretion. This argument would better be advanced to the executive branch.

Lastly, appellant argues that in the instruction on circumstantial evidence, the court used the word "should" instead of "must" in telling the jury that the circumstances *should* point to and be consistent with her guilt but *should* be inconsistent with any other reasonable hypothesis. Use of the word "must" would have been preferable, but we do not see how the jury could have been misled. The words are often

synonymous. Rodale, The Synonym Finder, Special DeLuxe Edition, p. 780. It is also significant that there was both circumstantial and direct evidence in this case and the choice of the word used was really less significant than it would be if the state relied solely upon circumstantial evidence. Appellant's argument, that the effect of the direct evidence cannot be considered in viewing the instruction because the jury was not told that it could convict on circumstantial *and* positive evidence, although it was made clear that it could convict on circumstantial or direct evidence, is not persuasive.

Although we do not take the instructions given to be inconsistent or inharmonious, we have not treated this argument in this opinion, because no such objection was made in the trial court.

The judgment is affirmed.

We agree. HARRIS, C.J., and GEORGE ROSE SMITH and BYRD, JJ.